On June 25, 1920, Ida May Mosier, an incompetent and restricted minor member of the Osage Tribe of Indians, died intestate, not married, and without issue, and left surviving her Eugene Mosier, her father, and Fannie B. Mosier, her mother. The father is a member of the Osage Tribe of Indians and the mother is a white woman, and were divorced on April 17, 1911. The mother had the care of Ida May Mosier from the time of the divorce to the date of her death.
This controversy arose between the parents of Ida May Mosier, deceased, as to the interest they inherited in the land and other property said deceased received as a member of the Osage Tribe of Indians. It is contended by the father that the estate of the deceased comes within the exception in section 6 of the Osage Allotment Act of June 28, 1906, and that, by the terms thereof, the mother and he inherited the estate of the deceased equally. The mother contends, however, that the devolution of the estate of said deceased is governed by the third subdivision of section 11301, Comp. Stat. 1921, which gives to her the entire estate of said deceased. The trial court sustained the contention of the mother.
The sole question presented here for determination is whether the exception in section 6 of the Act of Congress of June 28, 1906, c. 3572, 34 Stat. 539, commonly known as the Osage Allotment Act, or the laws of the state of Oklahoma govern the devolution of the estate of said deceased.
The lands, comprising the Osage Nation, now embraced within the territorial limits of Osage county, Okla., were acquired by the United States Government from the Cherokee Nation, and said lands were held in trust by the United States Government for the use and benefit of the Osage Indians until the Allotment Act, passed by Congress on June 28, 1906, when provision was made for the allotment of said lands in severalty to the individual members of the Osage Tribe of Indians, and making the further provision as to the manner in which the allotments were to be made, and providing for a disposition of the mineral rights, etc., and section 6 of said act provides for the descent and distribution of the land and other property, comprising the estates of deceased members of the Osage Tribe, as follows:
"That the lands, moneys and mineral interests herein provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the territory of Oklahoma, or of the state in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys and mineral interests must go to the mother and father equally."
The only act passed by Congress, pertaining to the Osage Indians, since said Allotment Act, was the act of April 18, 1912, c. 83, 37 Stat. 86, known as the Supplemental Act to the Allotment Act, and in this act, the Congress, by express terms, vests jurisdiction in the county courts of the state of Oklahoma over the estates of minor and other incompetent allottees of the Osage Tribe, but reserved the right in the United States Government, through the superintendent of the Osage Agency, to appear in the county court for the protection of the interests of the allottee; or, in other words, the Congress reserved the right to superintend the administration of the estates of said allottees, and a guardian appointed for a minor or incompetent heir could not sell or alienate any land belonging to his ward without the approval of the Secretary of the Interior. Said Supplemental Act provides for the disposition of the lands and personal property of members of the Osage Tribe by will in accordance with the laws of the state of Oklahoma, provided said will is approved by the Secretary of the Interior.
The foregoing shows some of the steps that have been taken, looking to the welfare of the individual members of the Osage Tribe of Indians, on the part of the United States Government, preparing them for the role of citizens of the United States and of the state of Oklahoma. Originally the members of the tribe were not permitted to handle or control any of the property, but it was all held by the United States Government in trust for the Osage Tribe as a whole, and this condition obtained for many years. The next step in the scheme of the government, acting in the capacity of guardian for the Osage Indians, was to release partially, to the members of the tribe, the property of the tribe by means of the Allotment *Page 230 
Act of June 28, 1906, above referred to, and then as the next step, the Congress passed the Supplemental Act of April 18, 1912, extending the powers and rights of the individual members of the tribe with reference to their property. As heretofore indicated, the United States Government has not yet fully released and discharged the members of the tribe from its guardianship, and as stated by the Supreme Court of the United States in the case of La Motte et al. v. United States,254 U.S. 570, 41 Sup. Ct. 206:
"The Osage Indians have not been fully emancipated and are still wards of the United States."
It is contended that, upon the admission of the state of Oklahoma into the Union, section 6, including the exception therein, of the Osage Allotment Act, supra, determining the descent and distribution of the estates of deceased members of the Osage Tribe, was repealed, and that the laws of Oklahoma, of descent and distribution were substituted therefor. This contention is made on the theory that sections 13 and 21 of the Enabling Act of June 16, 1906 (34 Stat. 267, c 3335), admitting Oklahoma as a state into the Union, and section 2 of Schedule to the Constitution of Oklahoma made the laws of descent and distribution of Oklahoma applicable to the Osage Indians; said sections 13 and 21 of the Enabling Act being:
"That the laws in force in the territory of Oklahoma as far as applicable shall extend over and apply to said state until changed by the Legislature."
And:
"Shall be in force throughout the said state except as modified or changed by this Act or the Constitution of Oklahoma."
And section 2, Schedule to the Constitution of Oklahoma, being:
"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union which are not repugnant to this Constitution and which are not locally inapplicable shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."
In making this contention, counsel have undoubtedly failed to recall that the Enabling Act was passed before the Osage Allotment Act; but if that were not true, this contention would be untenable, for there is no express provision contained in the Enabling Act repealing the exception in section 6 of the Allotment Act, supra, and if the same were repealed it would be by implication, and repeals of statutes by implication are not favored by law.
If the language of the Enabling Act is to be taken literally, then it must be conceded that the lands of members of the Osage Tribe of Indians were subject to the laws of descent and distribution of Oklahoma Territory which were put in force in the new state of Oklahoma, for it is provided in the Enabling Act that the laws of the territory of Oklahoma, and this would include the laws of descent and distribution of said territory, would be extended over and applied to the entire state of Oklahoma, and this would necessarily include all of the lands in the Osage Nation; but we cannot believe that Congress had this in mind or intended that the exception made in section 6 of the Allotment Act, supra, should be repealed. It must be borne in mind that at the time said Allotment Act was passed on June 28, 1906, the question of statehood for Oklahoma and Indian Territories was being agitated and the Congress knew and understood that it could be but a short time until statehood for these two territories would be a reality, and with this in mind the Congress provided, in section 6 of said act, that the lands, mines, and mineral interests of any deceased member of the Osage Tribe should descend according to the laws of the territory of Oklahoma, or of the state in which said reservation might be thereafter incorporated; showing clearly that Congress realized that statehood for Oklahoma Territory was imminent; but the Congress was not satisfied with the laws of descent and distribution of the territory of Oklahoma which were to govern the devolution of the estates of its wards, Osage allottees, where the allottee died without issue, husband, or wife, and leaving both father and mother, for the laws of the territory of Oklahoma in such case (which is the case at bar) gave the entire estate to the father, so the Congress, in order to protect those who were rightfully entitled to the estate of its wards, made an exception in this regard by providing in section 6, supra, that, under such circumstances, the estate should go to the mother and father equally. The Congress realized that perhaps the mother of such deceased allottee might be the only parent of Indian blood, and if the Oklahoma Territory laws of descent should govern, the father, a non-citizen, would get the entire estate to the exclusion of the mother, who gave to the deceased allottee the blood by which the entire estate was made possible. We are constrained to believe that this was special legislation by the Congress for the protection *Page 231 
of the estates of the allottees in their devolution.
It is not, and cannot be, questioned that the Enabling Act was general legislation on the part of the Congress; and it must be conceded that only the exception in section 6 of the Osage Allotment Act is special legislation and the remainder of said section is general legislation, and, under such circumstances, only the general legislation of said section 6 could be repealed by the general legislation of the Enabling Act, leaving in force and effect the special legislation, which is contained in the exception in said section 6.
The principle involved was before the Supreme Court of the United States in the case of Washington v. Miller,235 U.S. 422. In that case the court had under consideration whether the two provisos in section 6 of the Supplemental Creek Agreement (Act June 30, 1902) were special legislation, and there it was contended, as it is here, that the provisions of the Act of Congress of April 28, 1904, repealed the two provisos in section 6 of the Supplemental Creek Agreement, and in discussing this question Mr. Justice Van Devanter uses the following language:
"It next is insisted that the two provisos were repealed by a provision in the act of April 28, 1904, c. 1824, 33 Stat. 573, read-in as follows: 'All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise. * * *'
"No repealing clause accompanied this provision, so the question is, Did it repeal the provisos, by implication. There is no doubt that, if taken literally, it would subject the Creek lands to the Arkansas law of descent and distribution without any qualification or restriction. But this would be only by, reason of the generality of its terms, for it made no mention of that law or of those lands. In short, it was plainly a general statute and did not show that the attention of Congress was then particularly directed to the descent of the lands of the Creeks. On the other hand, sec. 6 of the supplemental agreement and its two provisos dealt with that subject in specific and positive terms which made it certain that the Creeks and their lands were particularly in mind at the time. In these circumstances we think there was no implied repeal, and for these reasons: First, such repeals are not favored, and usually occur only where there is such an irreconcilable conflict between an earlier and a later statute that effect reasonably cannot be given to both (United States v. Healey, 160 U.S. 136, 146; United States v. Greathouse, 601, 605); second, where there are two statutes upon the same subject, the earlier being special and the latter general, the presumption is, in the absence of an express repeal, or an absolute incompatibility, that the special is intended to remain in force as an exception to the general (Townsend v. Little, 109 U.S. 504, 512; Ex parte Crow Dog, Id., 556, 570; Rodgers v. United States, 185 U.S. 83, 87-89). and, third, there was in this instance no irreconcilable conflict or absolute incompatibility, for both statutes could be given reasonable operation if the presumption just named were recognized.
"No doubt there was a purpose to extend the operation of the Arkansas laws in various ways, but we think it was not intended that they should supersede or displace special statutory provisions enacted by Congress with particular regard for the Indians whose affairs were peculiarly within its control."
Neither do we believe, and it is no longer an open question under the foregoing authority, that the special legislation contained in the exception in section 6 of the Osage Allotment Act was repealed by the general legislation contained in the Enabling Act.
This question was again before the Supreme Court of the United States in the case of Jefferson v. Fink, 247 U.S. 288, which was appealed from the Supreme Court of Oklahoma (53 Okla. 272, 155 P. 852). That case involved the question of the devolution of the estate of a member of the Creek Tribe of Indians who died after statehood, and in June 1908, leaving surviving the father, brothers, and sisters, but no mother, husband, or issue, and all of the survivors were members of the Creek Tribe of Indians. The question involved was whether the estate of the deceased Creek citizen would descend according to the laws of the state of Oklahoma, unaffected by the provisos contained in section 6 of the Act of June 30, 1902, known as the Supplemental Creek Agreement. The effect of the holding of the court in that case was that the general legislation of the Congress by the Enabling Act, and the acceptance thereof by the people of the new state of Oklahoma, by the adoption of the Constitution of said state, extending the laws of the territory of Oklahoma over said state, repealed the general provisions of the Act of June 30, 1902, putting in force the provisions of chapter 49 of the laws of Arkansas over the Indian Territory as to descent and distribution, but left unaffected the two provisos in section 6 of said Supplemental Agreement, which was special legislation, for the protection of members of the Five Civilized Tribes. The second *Page 232 
paragraph of the syllabus bears out and supports the foregoing construction placed upon the opinion in that case, which is as follows:
"An allotment made under the Supplemental Creek Agreement (Act of June 30, 1902, c. 1323, 32 Stat. 500), before the admission of the State of Oklahoma, to a Creek freedman who died after the state's admission, descends (as among claimants who are all members of the Creek Tribe) according to the law of that state."
In other words, the court held in the Jefferson-Fink Case that, after statehood, lands allotted to a member of the Creek Tribe of Indians would descend according to the laws of the state of Oklahoma, but the heirs would be restricted to members of the Creek Tribe of Indians as provided for by the special legislation of the Congress in the two provisos in section 6 of the Supplemental Creek Agreement of June 30, 1902. In the body of the opinion of Jefferson v. Fink, supra, the court did not discuss at length this particular phase of the question, because, as has already been noted, all of the heirs in that case were members of the Creek Tribe of Indians and, therefore, there was no question about their participating in the estate of the deceased, but in referring to the question, the court uses the following language:
"It well may be, as held below that the qualification which Congress placed on the application of the local law — then the Arkansas law — by the Act of 1902 equally qualifies the application of the Oklahoma law, Washington v. Miller,235 U.S. 422, but that question is not here, for the survivors of the allottee are all Creek citizens."
How much more forceful language could be used than just quoted in saying that the qualifications which Congress placed on the Arkansas law of descent and distribution by the provisos in section 6 of the Supplemental Act of June 30, 1902, equally qualified the application of the laws of Oklahoma on descent and distribution?
By the same course of reasoning, we are driven to the following conclusion with reference to the devolution of the estates of restricted members of the Osage Tribe of Indians who died subsequent to statehood: That the laws of descent and distribution of the state of Oklahoma supplanted the laws of the territory of Oklahoma as to descent and distribution, put in force and effect in the Osage Tribe by section 6 of the Allotment Act of 1906, but with the exception set out in said section 6 of the Osage Allotment Act
Counsel for defendant in error strenuously insist that the Jefferson-Fink Case, supra, and the case of Pigeon v. Stevens,81 Okla. 180, 198 P. 309, are authority for their contention that the devolution of the estate of Indian citizens, who died since statehood, is governed, without qualifications, by the laws of the state of Oklahoma. We have already considered and disposed of this contention with regard to the Jefferson-Fink Case, and, as to the Pigeon Case, we think counsel have misconstrued the holding of the court therein. While some of the language used by the court, when taken alone, would tend to support the contentions made by counsel for defendant in error, yet, when the entire opinion is considered as a whole, we cannot see how such construction can be given it, and we are sure that no such meaning was intended. There, the devolution of the estate of Robert Pigeon, a member of the Creek Tribe of Indians, who died in October, 1918, was involved. The court held, and rightfully so, that said estate descended according to the laws of the state of Oklahoma, wholly unaffected by the provisos in section 6 of the Act of June 30, 1902. In arriving at this conclusion, the court held that, upon the admission of the state of Oklahoma into the Union, the laws of Oklahoma of descent and distribution, by reason of the Enabling Act and the provisions of the Constitution of the state accepting the conditions imposed by the Congress in said Enabling Act, became the local law which governed the Creek Indians, and supplanted or repealed the laws of Arkansas as to descent and distribution, placed in effect by section 6 of the Supplemental Creek Agreement, and held, further, that, after statehood, the estates of unrestricted Indians descend according to the laws of the state of Oklahoma, unaffected by the provisos in section 6 of the Supplemental Agreement. The court did not hold, as contended by counsel for defendant in error, that, upon the admission of the state of Oklahoma into the Union, the laws of Oklahoma governed the devolution of the estate of a deceased Creek Indian regardless of whether he was restricted or unrestricted, and wholly unaffected by the provisos in section 6 of the Supplemental Creek Agreement. The following language shows that the court was making this holding only as to restricted Indians; in discussing the effect of the Act of May 27, 1908, on this question the court said:
"It is very obvious that the Congress recognized that Indian lands located within the state of Oklahoma from whichrestrictions had been removed were subject to the operation *Page 233 
of the state laws, and by section 4 of said act provided that said lands should be subject to the laws of the state."
And again the court said:
"Upon the admission of the state of Oklahoma into the Union the same came into the Union with all the powers and sovereignty of any other state and upon the removal ofrestrictions against alienation and the granting of full citizenship to Indians, the federal government ceased to have any further power or control over the tribal citizens withrespect to unrestricted lands and all laws passed by Congress prior to statehood, either general or special, ceased with the admission of Oklahoma as a state to have force and effect in so far as unrestricted lands of tribal citizens are concerned."
Many such expressions are found throughout the body of the opinion, clearly indicating that the court restricted its holding, that the laws of Oklahoma, upon admission into the Union, governed the devolution of the estates of Indians unconditionally to the estates of unrestricted Indians. The first paragraph of the syllabus unmistakably reflects such intention of the court, wherein the following holding is made:
"All Indian lands from which restrictions have been removed, upon the death of allottee, descend according to the laws of descent and distribution of the state of Oklahoma."
And in construing the meaning of the succeeding paragraphs of the syllabi the holding of the court in the first syllabus must be taken into consideration. Upon the admission of the state of Oklahoma into the Union the laws of the state of Oklahoma, without qualification, did govern the devolution of the estates of all unrestricted Indians who held the fee title to their lands for the reason that such Indians were no longer wards of the United States government, and they became citizens of the new state of Oklahoma untrammeled in any way and on the same footing with every other citizen of the state of Oklahoma, and after statehood, as restrictions were removed, such Indians ceased to be wards of the government and stood on an equal footing in every way with citizens of the state of Oklahoma. and, therefore, the laws of the state of Oklahoma, without qualification, govern the devolution of their estates. By express provisions of the Act of May 27, 1908, the devolution of the estates of all restricted Indians were to be governed by the laws of the state of Oklahoma. and since that time the lands of Indians of the Five Civilized Tribes have descended according to the laws of the state of Oklahoma, without qualification in the same manner as those of unrestricted Indians.
The general stature of the Enabling Act on the question of descent and distribution supplanted and repealed the general statute of section 6 of the Supplemental Creek Agreement, and the special legislation of the Act of May 27, 1908. supplanted and repealed the provisos in section 6 of the Supplemental Creek Agreement, which were in the nature of special acts. This has reference, however, only to the Five Civilized Tribes.
There is no special act of the Congress repealing or supplanting the exception contained in section 6 of the Osage Allotment Act of June 28, 1906, which was in the nature of a special enactment, and, therefore, said exception has never been repealed.
As to the effect of the Act of Congress of May 27, 1908, on the devolution of the estates of members of the Five Civilized Tribes, the federal court, through Williams, district judge, in the case of Hill v. Rankin, 289 Fed. 511, held:
"Under Act of May 27, 1908, sec. 9, on the death intestate of a Creek allottee of restricted lands single and without issue, both his homestead and surplus lands descend to his heirs according to the laws of the state of Oklahoma whether or not such heirs are citizens of the Creek Nation."
Some confusion exists among the decisions of the Supreme Court of this state on this question.
In the case of Thompson v. Cornelius, 53 Okla. 85,155 P. 602, the devolution of the allotment of a Creek Indian who died in June, 1909, was involved, and the court held that the descent of the allotment of said Indian was confined to heirs who were members of the Creek Tribe and their Creek descendants. This was clearly erroneous because, regardless of the degree of blood of the deceased allottee, his lands, under the provisions of the Act of Congress of May 27, 1908, descended according to the laws of the state of Oklahoma without qualification, The court failed to take into consideration the effect of the Act of May 27, 1908.
The same error was made in Scott v. Ryal. 78 Okla. 12,186 P. 206. Hughes v. Bell, 55 Okla. 555, 155 P. 604, and Privett v. Rentie, 75 Okla. 191, 182 P. 898. In each of these cases the allottee died subsequent to the taking effect of the Act of May 27, 1908.
Some of these cases cite Jefferson v. Fink, supra, as authority for their holding, but *Page 234 
there is a material difference in the facts involved in the Jefferson-Fink Case and these cases citing the same. There the Creek allottee died on June 4, 1908, which was before the Act of Congress of May 27, 1908, went into effect; while, in these other cases, the descent was cast after the Act of May 27, 1908 became effective; and the court rightfully, under the facts of the Jefferson-Fink Case, held that the allotment of the deceased descended according to the laws of the state of Oklahoma with the qualification that the heirs should be restricted to members of the Creek Tribe of Indians and their Creek descendants. This, in our judgment, makes a very plain distinction in the cases.
Counsel for both parties have briefed and discussed the foregoing questions very thoroughly, which accounts for our considering them somewhat at length; however, the question could be disposed of by calling attention to the fact that the Enabling Act was passed on June 16, 1906, and the Osage Allotment Act on June 28, 1906, and therefore, it can not be urged that the latter was repealed by the former.
The judgment of the trial court is reversed, and the cause remanded with instructions to decree the plaintiff and the defendant to be the sole heirs of Ida May Mosier. deceased, and to award to them equal interests in the estate of said deceased.
By the Court: It is so ordered.