This case is here from a judgment of the district court of Osage county rendered after trial do novo on appeal from certain orders of the county court entered in the matter of final settlement and distribution of a decedent's estate. The case involves the question of the devolution of the real and personal property of a deceased Osage Indian of the half blood, and the rights of certain heirs to occupy his homestead allotment as a statutory homestead.
Cecil Martin, the aforesaid half-blood Indian, died intestate in Osage county in the year 1933, leaving surviving as his heirs at law a son, Howard Benjamin Martin, an Osage Indian of the quarter blood, and two adopted daughters. Helen Virginia Martin and Patricia Harlene Martin, neither of whom is of Indian blood, and his wife, Elma Martin who was also without Indian blood. The daughters assert that they and the son take the entire estate in equal shares, while the son, by virtue of his Indian blood, claims all the restricted estate, and equal share with each of the daughters in the unrestricted estate. The wife is not a party to the appeal, and apparently claims no interest. The children are all minors.
The trial court sustained the daughters in their contention, and further held that they were entitled to share and occupy the deceased's allotted homestead with the son as their statutory homestead, and rendered judgment accordingly.
From the aforesaid judgment, Howard Benjamin Martin has appealed.
Upon request of the parties, the trial court in its final judgment entered its conclusions of law classifying the property of deceased with reference to its character as restricted and unrestricted estate. A portion of these conclusions were excepted to by Helen Virginia Martin and Patricia Harlene Martin, and they have filed a cross-appeal.
The first and paramount question for determination is whether, in view of section 7, Act of Congress of February 27, 1925, 43 Stat. L. 1008, the adopted daughters, not being of Indian blood, may inherit any portion of the restricted lands, moneys, or mineral interests of the said Cecil Martin. That section reads as follows:
"Hereafter none but heirs of Indian blood shall inherit from those who are of one-half or more Indian blood of the Osage Tribe of Indians any right, title, or interest to any restricted lands, moneys, or mineral interests of the Osage Tribe; Provided, that this section shall not apply to spouses under existing marriages."
It is conceded that the devolution of the restricted estate of a deceased Osage Indian is controlled by the laws of descent and distribution of the state of Oklahoma, subject entirely, however, to the acts of Congress.
For convenience, the adopted daughters will be hereafter referred to as plaintiffs, and the son as defendant.
Defendant says section 7, supra, clearly reflects the intention of Congress that none but heirs of Indian blood may inherit the restricted properties of a deceased member of the Osage Tribe of one-half or more Osage blood. The case of In re Thompson's Estate, 179 Okla. 240, 65 P.2d 442, is cited in support of this contention.
Plaintiffs take the position that Congress did not have in mind and did not intend that the act should apply to adopted white children, maintaining that the proviso clearly so indicates. It is here urged that said proviso would show that Congress had in mind only the white spouse, and that the section was designed wholly for the purpose of discouraging future mercenary marriages between the Osages and the whites. They say that defendant's contention may be supported by the letter of the act, but that the matter contended for is not within the spirit thereof, nor was it within the intention of the makers.
To apply the strict construction sought by defendant would, say the plaintiffs, prove illogical and bring about an absurd situation, the denial in future of the right of the white parent to inherit the restricted property of his or her half-blood child born prior *Page 179 
or subsequent to the passage of the act. They urge that no logical reason could exist why Congress would be more solicitous of the welfare' of the spouse under an existing marriage than it would be of the welfare of the white parent of a deceased half-blood child born prior to the act, or of the welfare of adopted white children whose adoption took place prior thereto.
Plaintiffs assert that the aforesaid alleged absurdities, together with the circumstances surrounding the enactment of the measure as revealed in the record before us, fully sustain their contention, rendering unreasonable the belief that Congress intended that any heirs other than white spouses of future marriages should by said legislation be denied the right of inheritance.
In the Thompson Case above, we said that section 7 was not ambiguous, and that Congress had said therein that in order for heirs to inherit the restricted property of those who are of one-half or more Osage Indian blood must themselves be of Indian blood. There we were attempting to arrive the legislative meaning of the words "heirs of Indian blood"; whether or not those words should be so construed as to mean "heirs of Osage Indian blood." The language used in arriving at our conclusion may have been too general and the case may furnish, as plaintiffs say, "a good illustration of the danger in attempting to make a general statement in an opinion applicable to all cases involving a statute concerning which such general statement was made." But an inspection of the Thompson Case will reveal that, so far as the question presently involved is concerned, we confined our rule of law, as the syllabus will show, to the question whether a spouse of Indian blood, though not of the blood of the Osages, could inherit. We merely held that the act was not ambiguous to the point of rendering obscure the intent of Congress in the use of the words "heirs of Indian blood."
The Thompson Case did not involve white heirs. Therefore plaintiffs are in no way bound by the interpretation there placed upon section 7. But we do say that by said section Congress did, in effect, express itself in the language as we there said it did, "that such persons in order to inherit the restricted property of those who are of half or more Indian blood of the Osage Tribe shall themselves be of Indian blood." Such is the apparent meaning of the language employed by Congress: "none but heirs of Indian blood shall inherit." Plaintiffs say, however, that the proviso has clouded the meaning of the section sufficient to permit of judicial construction by the employment of means outside the act itself. It is contended that the surrounding circumstances as appear in evidence are sufficient, when considered in connection with said proviso, to show an intent on the part of Congress to restrict the section to white spouses of subsequent marriages, and to negative the idea that Congress intended to interfere with the rights of adopted white children.
If we are to examine into the history of the legislation and contemporaneous circumstances, we are compelled to admit that the act is ambiguous. McCain v. State Election Board,144 Okla. 85, 289 P.2d 759. We held there as follows:
"Where the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for constriction, and the courts are not permitted to search for its meaning beyond the statute itself."
We agree with plaintiffs that in event the act is ambiguous, we may look to the circumstances surrounding its enactment, the condition or evil it was designed to remedy, in order to arrive at the intent of Congress, and we agree that the general terms employed therein should be so construed as to avoid injustice, oppression and absurd consequences, and that the spirit, not the letter, should ordinarily control. Church, etc., v. United States, 143 U.S. 457, 36 L.Ed. 226. It is not to be presumed that Congress would intend its legislation to work undue hardship upon anyone. The presumption is to the contrary. But its power to cast descent and control the devolution of estates in cases of this character is unlimited, and what may seem arbitrary and unjust, or absurd, is not prohibited, but is merely an incident to that power.
If such statutes are clear and unmistakable in the language employed therein, they must generally be accorded their literal meaning. Whether the result accords with right and justice, and logic, in the eyes of the court, is a question of no judicial concern. We agree with the statement of the Supreme Court of California in Re Kirby's Estate, 121 P. 370, that "the right of inheritance in this state does not depend upon the ideas of court or counsel as to justice and natural right. The entire matter is in the control of the Legislature, and depends wholly upon the provisions of the statute, regardless of our notions of natural right and justice." As that statement well applies *Page 180 
to the instant case, Congress occupies the position of the Legislature therein.
Considering section 7 in the light of congressional policy toward the various Indian nations as disclosed by its legislation, and the judicial interpretations thereof, we are unable to say that said section is ambiguous. We see no clouded meaning of the language therein employed. This may seem a too general statement for the purposes of this case, but the act simply makes it impossible for whites to inherit under the circumstances there set out, except spouses of prior marriages. The proviso making this exception is clear, and it does not include any other class of heirs. We must presume that Congress knew at the time that other classes of heirs existed. If it had been the intention to exclude them from the operation of the statute, the process to that end would have been simple; they could have been named along with the aforesaid spouses in the proviso. To add them now is not within the province of the courts. If one may think the act results in undue hardship, witness the Supplemental Creek Agreement, 32 Stat. 500, where property of the deceased followed the Creek blood, making it impossible for a non-Creek blood, parent to inherit from the child (McDougal v. McKay, 237 U.S. 372, 59 L Ed. 1001); and also the Seminole Agreement, 31 Stat. 250, to like effect. See Campbell v. Wadsworth, 248 U.S. 169, 63 L Ed. 192. In the latter case the Supreme Court had the following to say concerning the acts of Congress relating to the devolution of Indian estates, and the language is appropriate here:
"All statutes of descent and distribution are arbitrary expressions of the purpose of the lawmaking power, and that the provisions of such a statute do not happen to meet the notions of justice of a court is not sufficient reason for indulging in an interpretation which modifies their plain and unambiguous terms. Especially is this true of these Indian statutes, which are a progressive development, embodying concessions to tribal custom and tradition necessary to be made in order to accomplish a practical, though perhaps not an ideal, dissolution of the tribal relation and distribution of the tribal property."
No doubt, as plaintiffs suggest, the act in question was to some degree designed to discourage mercenary marriages between the whites and the Osages; but might not the adoption of a white child be as well the result of mercenary design on the part of someone? Congress may have held that belief, and determined that a white child was no more entitled to inherit the restricted property than was a white spouse of a subsequent marriage. The most that can be said is that Congress did exclude them from inheritances of the character named.
In view of the fact that there is nothing contained in the present act that would cast a cloud upon the intent of Congress therein expressed, we will not go outside the same for information in aid of its interpretation. We hold, therefore, that the language of the act clearly expresses an intent to deny inheritance to heirs who are not of Indian blood, except spouses of prior marriages, and that the proviso referring to such spouses is clear and unambiguous and does not in any manner render the meaning of the remainder of the act confusing as to the actual legislative intent, and that by reason thereof adopted white children of an Osage of the half-blood whose adoption occurred subsequent to the act may not inherit his restricted property. The trial court erred in holding to the contrary.
Plaintiffs' contention concerning the right to occupy the homestead must also fail. These adopted children were living on the Osage homestead of the allottee at the time of his death. To allow them to retain possession of the premises as a statutory homestead would be contrary to the plain intent of Congress that such heirs should take no part of the restricted estate. The situation here is analogous to that of a noncitizen heir of a Creek Indian, for, we think is may well be said, Congress was moved by the same intent and purpose in the enactment of the laws of descent and distribution of both nations, wherein the inheritance was restricted to citizens or Indians. In Scott v. Ryal, 78 Okla. 12, 186 P. 206, speaking of a noncitizen heir who claimed the right of homestead occupancy of allotted lands of a Creek Indian, the court said:
"In our judgment, to concede this substantial right to the defendant would be subversive of the well-known purpose of Congress in passing section 6 of the Supplemental Agreement, protecting the right of citizens of the Creek Nation to inherit the lands thereof, to the exclusion of noncitizen heirs."
Although that decision has since been referred to by this court as erroneous (In re Moster's Estate, 109 Okla. 228,235 P. 199. 204), in that the devolution of the estate of a Creek citizen who died subsequent to statehood was erroneously held to be controlled by the provisions of the Supplemental Creek Agreement instead of the state laws, the reasoning there adopted may well be followed here, since the court, construing said act, *Page 181 
concluded that a noncitizen heir could not occupy the allotment as a homestead. Congress may have abandoned the plan as to the Creeks, but not as to the Osages.
By cross-appeal plaintiffs attack the trial court's conclusions of law with reference to the property designated as restricted within the meaning of said section 7.
If the trial court had reached a correct conclusion in its judgment permitting plaintiffs to inherit their proportionate part of all the property of the deceased, the errors assigned in their cross-petition would now be immaterial. But we have held the conclusion erroneous. If plaintiffs are now to sustain the judgment in whole or in part with reference to the alleged restricted property, they must show that the court's conclusions of law were in whole or in part erroneous, and that the property held as restricted was in fact unrestricted, permitting plaintiffs to inherit the same.
The trial court awarded plaintiffs everything they sought, leaving them without final adverse judgment to appeal from. But, in order to uphold their judgment, they saved exceptions to the court's conclusions of law, which, in an equity case, entitles them to a review of those conclusions without formality of cross-appeal. Muskogee Refining Co. v. Waters Pierce Oil Co., 89 Okla. 279, 215 P. 766. This cause, being in its nature equitable, stands here for final disposition if circumstances will permit, and, looking toward final determination, we will review all rulings duly excepted to by defendants in error.
Plaintiffs say the trial court erred in holding that the allotted lands, and the allotted and inherited funds, commonly known as surplus funds, and the proceeds of a certain policy of life insurance held by the Superintendent of the Osage Agency for the deceased, constituted restricted property within the meaning of section 7 of the act.
The argument is that Congress was not attempting to legislate with reference to the property of the individual members of the tribe, but was dealing wholly with the common property of the Osages. It is urged that the plain language of the act sustains this contention. The portion thereof referred to is, "any right, title, or interest to any restricted lands, moneys or mineral interests of the Osage Tribe."
Plaintiffs take the position that all the lands allotted and conveyed to the individual Indian, and the moneys allocated, segregated, and deposited with the Superintendent to his account, do not constitute property of the "Osage Tribe," concerning which Congress was legislating, but property of the individual members of the tribe. The same argument is employed with reference to the life insurance policy.
It is suggested that the circumstances surrounding the enactment of the legislation, as placed in evidence, will show that Congress advisedly refrained from making the act apply to the individual members of the tribe. Here we say again that if the provision presently under consideration is ambiguous, rendering the same uncertain as to the real intent of Congress, we may look to any historical or contemporary circumstance properly in evidence that may throw light upon the provision with reference to such intent. Plaintiffs say that the bill as first drawn and proposed contained the words "or any enrolled member thereof" immediately following the above-mentioned words "Osage Tribe." They say, further, that in the previous acts dealing with these Indians, Congress many times drew a distinction between and legislated with reference to the tribe and the individual member, all of which, it is in effect suggested, leads to the ultimate conclusion that Congress in the present measure was referring to the tribe and its common property and not to the separate property of the individual member thereof.
We are, however, unable to agree that the provision is ambiguous and uncertain as to the real intent of Congress to that degree requiring us to give consideration to circumstances outside the act itself. In the first place, section 7 deals with succession; it is a law governing the descent and distribution of the estates of a designated class of decedents. Laws governing the devolution of property contemplate only the estates of individuals; the property of nations is not inherited by its citizens as heirs within the meaning of such laws. The Osage Nation has no heirs, nor property subject to succession. All the lands, moneys, and other properties commonly said to belong to that nation and yet remaining undistributed to the individual citizens thereof, or their heirs, are now held in trust by the United States for the use and benefit of the individual citizen, or his heirs who are eligible. Act Cong. March 2, 1929, 45 Stat. L. 1478. The individual citizen, or his heirs, has a vested undivided interest in such lands, moneys, or other properties, and such interest is an estate that may pass from the citizen to his *Page 182 
heirs by inheritance, not from the tribe to such heirs. In Globe Indemnity Co. v. Bruce, 81 F.2d (C. C. A. 10) 143, 150, the court, speaking of section 6 of the Act of Congress of June 28, 1906, said:
"This section indicates that a present equitaable interest in the lands, moneys, and mineral interests vested in the members of the tribe and on the death of a member descends to his heirs."
In referring to the "lands, moneys, or mineral interests of the Osage Tribe," Congress could have meant nothing other than the vested interests of the individual member thereof, which interest included his allotted lands and moneys and his vested, though undivided, interest in the minerals and other property commonly referred to as lands and mineral interests of the Osage Tribe. Congress was dealing with individual estates, for there was no other property to deal with. It merely referred to such individuals collectively as the Osage Tribe.
In the Supplemental Creek Agreement, 32 Stat. L. 500, ch. 1323, there is a provision similar to the one here under consideration. The provision is that 'only citizens of the Creek Nation, male and female, and their Creek descendants, shall inherit the lands of the Creek Nation." The courts, state and federal, have always, though without question, accepted this as referring to the allotted lands of the individual citizens, and not to surplus property of the Creek Nation.
It is conceded that the allotted lands in the instant case, the allotted and inherited mineral rights (headrights), and the allotted and inherited funds commonly known as surplus funds, constitute restricted property of the deceased. Since the same is restricted, it descends to defendant to the exclusion of the plaintiffs.
The proceeds of the insurance policy were held to be restricted. The policy was taken out by deceased and one or more premiums paid thereon by him. He thereafter assigned it to the Superintendent of the Osage Agency in trust, and the premiums were thereafter paid by the Superintendent out of deceased's restricted funds. The insurance company paid the money into the Agency.
The parties furnish us little argument and no authority in support of their contentions pro and con on this question. We hold, however, that the benefits accruing from the policy were restricted, since the premiums were paid from restricted funds apparently with the consent of the insured, and for his benefit as permitted by section 1 of the Act of Congress, February 27, 1925, 43 Stat. L. 1008. Since it is not made to appear otherwise, we are to presume that the Superintendent of the Osage Agency, by authority of the Secretary of the Interior, considered the benefits derived from the policy as restricted. Said section 1 of the act allows "expenditures * * * to be made under such restrictions, rules, and regulations as he (the Secretary of the Interior) may prescribe." The expenditures referred to are those for the benefit of the Indian, and would include a policy of life insurance.
As to the conclusions of the trial court concerning the restricted or unrestricted character of the remaining property of the estate, the parties furnish us with little argument and no authority in support of their respective contentions. We are not to be presumed conversant with every act of Congress relating to the property of the Osages, and, in the absence of proper reference thereto, we will not search out the details thereof. Neither will the trial court's conclusions be reversed in the absence of adequate argument or authorities sufficiently supporting a contrary view.
We hold, therefore, that the trial court was correct in its conclusions with reference to the restricted and unrestricted character of the decedent's property, but erred in holding that plaintiffs were entitled to inherit an interest in that portion of the estate held to be restricted.
The judgment is therefore reversed and the cause remanded, with directions to enter judgment in accordance with the views herein expressed.
BAYLESS, V. C. J., and RILEY, PHELPS, CORN, and HURST, JJ., concur. OSBORN, C. J., and WELCH and DAVISON. JJ., absent.