871 F.2d 924
 Norman R. AKERS and Vicki Akers Pratt, Plaintiffs/Appellants,
v.
Donald HODEL, Secretary of the United States Department of
the Interior, Defendant/Appellee.
In the Matter of the WILL OF Victor AKERS, Unallotted Osage
Indian Deceased.
Mary Monette AKERS, Petitioner,
v.
UNITED STATES of America and Donald Hodel, Secretary of the
United States Department of the Interior, Respondents.
 No. 86-2898.
 United States Court of Appeals,
Tenth Circuit.
 March 24, 1989.
 
 F. Browning Pipestem (Jess L. Burris on the briefs), Pipestem & Rice, Norman, Okl., for plaintiffs/appellants Norman R. Akers and Vicki Akers Pratt.
 Robert E. Martin, Tulsa, Okl., for Mary Monette Akers.
 Phil Pinnell, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty. with him on the brief), Tulsa, Okl., for defendant/appellee.
 Before MOORE, ANDERSON and BALDOCK, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 This case concerns the will of Victor N. Akers, a deceased Indian with both Osage and Pawnee property interests that he bequeathed to his wife and two grown children. Because of his tribal affiliations and the nature of his holdings in Indian country, his will was subject to approval or disapproval by the Secretary of the Interior. If Akers fell within the Congressional definition of an Osage Indian, then under authority delegated by the Secretary, the Osage Agency Superintendent was to review the will. If, on the other hand, he fell within the Congressional definition of a Pawnee Indian, then an Interior Department administrative law judge was to review the will. In either event the will could not be probated without approval from the proper Interior Department authority.[1] If Akers' will were to be disapproved, then it would be invalid, and inheritance would proceed under the Oklahoma intestacy provisions.
 
 
 2
 Akers filed his will with the Osage Agency in Pawhuska, Oklahoma. After Akers' death on January 22, 1984, the Osage Field Solicitor held a hearing on the will and thereafter recommended to the Osage Agency Superintendent that the will be disapproved. The Superintendent accepted the recommendation, finding that although Akers possessed testamentary capacity and the will had been properly executed, Akers' refusal therein to acknowledge an illegitimate son as his child was the result of an insane delusion that materially affected the terms of the will. This finding was upheld by the Southwest Regional Solicitor of the Interior Department, acting for the Secretary.
 
 
 3
 After completion of the Secretary's administrative review process, Akers' grown children, Norman and Vicki, sought reversal of the Secretary's decision in federal court. An action by Akers' widow, Mary Monette Akers, was consolidated with that of the two children, who were apparently from a former marriage. At this stage new attorneys were utilized by both sets of plaintiffs. At the status conference, agreement was reached that the district court would treat the case as an appeal to be decided after briefing and oral argument before a federal magistrate. In federal court the plaintiffs asserted for the first time that Akers did not meet the legal definition of an Osage Indian and had chosen to be enrolled as a Pawnee; therefore, they asserted that the Osage Agency did not have jurisdiction over the will. The plaintiffs sought to void the already exercised Osage Agency jurisdiction, urging a remand to the Secretary for reconsideration of Akers' will by the Pawnee Agency. Alternatively, the plaintiffs argued that if Osage Agency jurisdiction was correct, then the Secretary erred in finding that Akers was subject to an insane delusion materially affecting the terms of his will. The district court accepted the magistrate's recommendation that the Secretary's actions be upheld.
 
 
 4
 The same challenges to the Osage Agency's jurisdiction and to the Secretary's disapproval of the will are raised on appeal. After careful review of the record and upon close consideration of the statutes governing the Osage and Pawnee Indians, plus the relevant legislative history, we uphold the Osage Agency finding that Akers was an Osage Indian and therefore affirm the Osage Agency jurisdiction for purposes of approving or disapproving Akers' will. We reverse, however, with respect to the Secretary's conclusion that Akers was subject to an insane delusion.
 
 FACTUAL BACKGROUND
 
 5
 Akers executed a will on June 15, 1983 and filed it with the Field Solicitor at the Osage Agency at Pawhuska. The will had been prepared by an attorney and its form had been approved by the Osage Field Solicitor. In his will Akers stated, "I have but two children and ... the names of such children are Norman Akers and Vicki Akers Pratt." Exh. 1 at Will Hearing before the Field Solicitor, June 19 and August 30, 1984. In two subsequent paragraphs he stated: "I give the sum of $5.00 and nothing more to any person other than Norman Akers and Vicki Akers Pratt who claims to be my child.... I give and bequeath to Lone Elk Akers the sum of $5.00, love and affection and nothing more." Id. Akers' wife Mary and the two acknowledged children received equal life estate interests in the bulk of his estate, which included 3.06186 Osage headright (mineral) interests valued at more than $400,000, Pawnee oil royalties and rent payments, and 260 acres of federally restricted real estate. He also gave a life interest in his home at Grayhorse Indian Camp (an Osage Village) to his daughter. Id.
 
 
 6
 The Osage Superintendent, on the recommendation of the Field Solicitor, disapproved Akers' will for Akers' failure to acknowledge Lone Elk Monte Akers ("Lone Elk") as his child, finding that Akers had previously so recognized Lone Elk in a paternity affidavit bearing his signature.[2] At the will hearing before the Field Solicitor, Lone Elk's mother, Ella Robedeaux Ross ("Ross"), introduced photographs of Akers with Lone Elk, and testified that Akers gave Lone Elk occasional gifts and had acknowledged him as his son in the presence of friends. Copies of Lone Elk's birth certificate and certificate of degree of Indian blood were also introduced, both giving the father's name as Victor Akers. Copies of court documents were introduced, showing that in December 1977, approximately eleven months after Lone Elk's birth, Ross had filed suit against Akers for child support and obtained a temporary injunction and child support order. By April 21, 1978, Akers was shown on court records as having moved out of Oklahoma and unable to be served with a citation for failure to comply with the child support order. No further judicial action was taken.[3]
 
 
 7
 The administrative record also contains copies of letters revealing that as early as April 20, 1978, Akers had written to the Osage Agency seeking information as to whether he could give life estates in his headrights to his "two children." Exh. 2 at Will Hearing of June 19 and August 30, 1984. He inquired twice more in succeeding weeks before receiving a response from the Agency. In other words, around the time he moved out of state and could not be served with a judicial citation, he was omitting in a series of letters to the Osage Agency any reference to a third child. The letters do not deny paternity of Lone Elk, but they do indicate that whether or not he viewed Lone Elk as his child, as far back as 1978 Akers had no interest in devising a share of his headright interests to any children other than Norman and Vicki.
 
 
 8
 With respect to Akers' Osage and Pawnee affiliations, the following information appears in the administrative record. At the agency hearing, Ross stated that Akers was both Osage and Pawnee. Will Hearing of August 30, 1984 at 7. She stated that she met him in 1967 at the Osage dances at Fairfax. Id. at 3. In a letter signed by Ross dated July 17, 1977, and received at the Osage Agency, Ross wrote that the attached copy of Lone Elk's birth certificate was to be filed in the "family history files of Victor N. Akers, unallotted Osage Indian."[4] R. Vol. III at tab 2. Bill Bigheart, a witness to Akers' will, testified that he had worked for a number of years at the Osage Agency and had known Akers because of his frequent visits to the Agency to pick up his "IIM funds" on deposit there. Will Hearing of June 19, 1984 at 29. Furthermore, no one denies that Akers himself filed his will with the Osage Agency. Additionally, in his application for approval of the will, the executor of Akers' estate stated that Akers was an adult member of the Osage Tribe. R. Vol. III at tab 1. Finally, on all documents related to the will hearing, Akers is referred to as unallotted Osage.[5]
 
 
 9
 In his written disapproval of the will, the Superintendent found that Akers was an Osage Indian "with 3.06186 headright interests and real estate and personal property subject to jurisdiction of the Osage Agency." Although authenticated documentary evidence of Akers' enrollment on the census records of the Osage Agency was not entered in evidence, there was no challenge at the administrative level to the evidence that Akers was an Osage Indian. Evidence in Lone Elk's certificate of Indian blood that Akers was part Pawnee was not used to suggest that he was not an Osage Indian.[6]
 
 I.
 
 10
 Norman, Vicki, and Mary Akers ("appellants") assert that the Secretary erred in finding that Victor Akers was an Osage Indian for purposes of will approval, and that, therefore, the Osage Agency exceeded the scope of its authority. They urge a remand to the Secretary for review of Akers' will by the Pawnee Agency. They make two arguments. The first argument is that, under the relevant federal statutes, Akers is not an Osage Indian because he was not enrolled as a member of the tribe when the statutory roll designating tribal members closed on July 1, 1907. The second argument is that Akers' Certificate of Degree of Indian Blood filed with the Pawnee Agency and submitted to the federal court (but not to the Secretary) is proof that Akers was legally enrolled as a member of the Pawnee tribe and therefore could not be enrolled simultaneously in the Osage tribe. The Secretary, in response, asserts that (1) the appellants' interpretation of what constitutes a statutory definition of an Osage Indian for will approval purposes is incorrect as a matter of law, (2) the record established that Akers was an Osage Indian under the Congressional definition, and (3) in any event, additional evidence is inadmissible at this point. If Akers is found to fit the statutory meaning of an Osage Indian, both sides agree that Sec. 5(a) of the Osage Indian Act of 1978, Pub.L. 95-496, 92 Stat. 1660, 1661 governs; if instead Congress would consider him to be enrolled as Pawnee, both sides agree that 25 U.S.C. Sec. 373 is the applicable provision.
 
 
 11
 Preliminarily, we note that there is no challenge to the jurisdiction of the Secretary, just to whether the Osage Agency was the proper agency to exercise the Secretary's jurisdiction. This challenge to whether the Interior Department followed its own procedures depends on a mixed issue of law and fact: under existing federal legislation and under the facts as developed in the record, is Akers an Osage Indian or a Pawnee Indian?
 
 
 12
 Although review of the disapproval of an Osage Indian will is governed by the standard of review found in section 5(a) of the Osage Indian Act of 1978, the appellants argue that a decision as to whether the correct agency reviewed the will in the first place is governed by the Administrative Procedures Act ("APA"). Appellees argue that section 5(a) governs both the review of the will's disapproval and the preliminary question of whether the will was, in fact, made by an Osage Indian. Neither side cites relevant case law to support its argument. In our view, the standards established by the APA govern a situation alleging that the Osage Agency illegally exercised jurisdiction over a Pawnee Indian.[7] The relevant APA standards of review require that a reviewing court set aside agency action found to be "not in accordance with law" or "unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute...." 5 U.S.C. Sec. 706(2)(A) and (E). If the appellants are correct that only Osage Indians on the roll authorized by the Act of June 28, 1906 are considered by Congress to be Osage Indians today, then the Osage Agency did not act in accordance with law because Akers had not been born when the roll closed. If, on the other hand, the appellants are incorrect, then we must determine whom Congress considers to be an Osage Indian and whether there is substantial evidence in the record supporting the conclusion that Akers was one.
 
 
 13
 The original federal law regulating the property and affairs of the Osage Indians, including their tribal government and tribal property, is the Act of June 28, 1906, ch. 3572, 34 Stat. 539 (1906). See H.R.Rep. No. 1459, 95th Cong., 2d Sess. 2 (1978). The Act has been amended numerous times in subsequent decades, including by the Osage Indian Act of 1978. We must examine the implications of the original 1906 Act and its subsequent amendments to determine whether federal legislation contemplates a finding that Akers is an Osage Indian for purposes of will approval.
 
 
 14
 The 1906 Act provided for a closed roll of Osage Indians for the stated purpose of allotting in severalty to individual Osage Indians most of the lands in Oklahoma territory belonging to the Osage tribe, subject to restrictions on alienation. A small amount of territory was reserved for tribal purposes, and the mineral interest in all the lands was retained in trust by the federal government. Under the 1906 Act, the roll, actually prepared in 1908,[8] was to consist of those recorded on the official roll at the Osage Agency as of January 1, 1906, plus all children born to those enrollees between January 1, 1906 and July 1, 1907, plus all children already born to those enrollees but whose names were not on the roll as of January 1, 1906. 34 Stat. 539. The Osage lands were divided among these persons, i.e., essentially among those who by mid-1907 were members of the tribe. The roll authorized by the 1906 Act was said to constitute "the legal membership" of the tribe. Id. The primary purpose of the roll was to determine the persons entitled to share in the distribution of tribal funds and to receive an allotment of the surface lands. See United States v. Ickes, 117 F.2d 769, 770-71 (D.C.Cir.1940), cert. denied, 313 U.S. 575, 61 S.Ct. 1088, 85 L.Ed. 1533 (1941). Each person constituting a legal member of the tribe at that time was referred to as an "allottee." The mineral estate was not allotted but remained tribal property held in trust by the federal government. Funds earned by the trust were distributed per capita to the allottees. This "headright" interest (the term commonly used to designate the per capita share in the tribal mineral estate) could be conveyed to heirs and devisees, but since 1984 no more than a life estate in the headright can be conveyed to one who is not an Osage Indian. Osage Tribe of Indians Technical Corrections Act of 1984 ("Technical Corrections Act"), Pub.L. 98-605, 98 Stat. 3163, Sec. 2(e) (1984).
 
 
 15
 The first will provision specific to the Osage was introduced in a 1912 amendment to the 1906 Act. Section 8 of 37 Stat. 86 stated:
 
 
 16
 "[A]ny adult member of the Osage Tribe of Indians not mentally incompetent may dispose of any or all of his estate, real, personal, or mixed, including trust funds, from which restrictions as to alienation have not been removed, by will, in accordance with the laws of the State of Oklahoma: Provided, That no such will shall be admitted to probate or have any validity unless approved before or after the death of the testator by the Secretary of the Interior."
 
 
 17
 Act of April 18, 1912, ch. 83, 37 Stat. 86. In 1912 the only adult members of the tribe would have been those included on the 1908 roll because children born since 1907 would not yet have reached adulthood. Over time, however, the issue would arise as to whether those born after the roll closed could mature into adult "members of the tribe" for purposes of the will provision. If not, then only original allottees were required to have their wills approved by the Secretary; those inheriting the same allotments would not be similarly bound but could devise any inherited Osage allotments without Department approval.[9]
 
 
 18
 Recognition of two distinct subsets of Osage Indians appeared in statutory language as early as 1929. In that year, an amendment to the 1906 Act provided that "[t]he restrictions concerning lands and funds of allotted Osage Indians ... shall apply to unallotted Osage Indians born since July 1, 1907 ... and to their heirs [presumably heirs of both subsets] of Osage Indian blood, ..." Act of March 2, 1929, ch. 493, 45 Stat. 1478, Sec. 5 (1929) (emphasis added). Despite this recognition of two types of Osage Indians for the purpose of maintaining restrictions on alienation of Osage lands and funds, arguably the question remained as to whether unallotted Osage were to be considered Osage for purposes of will approval.[10]
 
 
 19
 In 1978, the will provision of the 1912 statute was amended in pertinent part, as follows, (as subsequently amended by the Technical Corrections Act of 1984):
 
 
 20
 "Any person of Osage Indian blood, eighteen years of age or older, may dispose of his Osage headright or mineral interest and the remainder of his estate (real, personal, and mixed, including trust funds) from which restrictions against alienation have not been removed, by the terms of a will ... executed in accordance with the laws of the State of Oklahoma ...: Provided, That the will of any Osage Indian shall not be admitted to probate or have any validity unless approved after the death of the testator by the Secretary of the Interior.... All evidence relative to the validity of the will of an Osage Indian shall be submitted to the Secretary within one hundred and twenty days after the date the petition for approval of such will is filed with the Secretary,...."
 
 
 21
 Osage Indian Act of 1978, Pub.L. 95-496, 92 Stat. 1661, Sec. 5(a) (1978), as amended by The Technical Corrections Act, Pub.L. 98-605, 98 Stat. 3166, Sec. 3 (1984), both amending the Act of April 18, 1912, 37 Stat. 86, Sec. 8 (1912) (emphasis added).
 
 
 22
 Both parties concede that the Osage Indian Act of 1978, including the above will provision, does not define the term "Osage Indian" as used therein. After examining the prior and concurrent legislative histories and subsequent amendments to the 1978 Act, we are convinced that appellants are incorrect in arguing that the term "Osage Indian" means only those recognized by the 1906 Act as legal members of the tribe.
 
 
 23
 As described in the legislative history accompanying 1972 amendments to the 1906 Act, "Osages born since July 1, 1907, when the legal membership roll was closed are known as 'unallotted' members of the tribe. They cannot vote in tribal elections, hold tribal office, or share in the quarterly distribution of tribal income unless they become an heir or devisee of a deceased 'allotted' member." H.R.Rep. No. 963, 92d Cong., 2d Sess. 9 (1972) (emphasis added). According to the same legislative history, the Osage population by 1972 had increased to 8,224, up from the original count of 2,229 when the roll was closed in 1907. Four hundred and forty-seven of the 2,229 enrollees were still living. Those 447 had 2,384 living descendants; deceased enrollees had 5,413 descendants. Id. at 2. Only living enrollees and heirs of deceased enrollees have shares in the original allotment. For instance, in 1972 there were only 3,270 owners of Osage headrights. Id. at 9. In other words, all living Osages do not share in the original land allotment or in the headright interest if they are not heirs or devisees. See F. Cohen Handbook of Federal Indian Law 790-91 (1982 ed.). Notwithstanding the limited rights of unallotted Osage Indians who are not heirs or devisees of an allotted Osage, the above descriptions make clear that unallotted Osage Indians are not relegated by Congress to the category of non-Osage Indians.
 
 
 24
 Turning to the language of the 1978 Act itself, the term "member of the tribe" is used only once (in Sec. 6(b)) to designate a class of persons, and it is eliminated by the Technical Corrections Act of 1984, which substitutes the term "Osage Indian" in its place. 98 Stat. 3163, Sec. 2(d). The plain inference to be drawn from the substitution of terms is that the original usage of the phrase "member of the tribe" in the 1906 Act, designating membership for allotment purposes, is not to be read into the 1978 Act. Moreover, in section 5(b) of the 1978 Act the term "Osage Indian" is substituted for the term "allottee" used in the predecessor section (Sec. 3) of the 1912 statute, suggesting that both allotted and unallotted Osage are to be covered by the amended provision. The legislative history of the 1978 Act confirms this reading of the will provision.[11]
 
 
 25
 It is unmistakable that an "Osage Indian" encompasses a broader group than those considered members of the tribe when the 1908 roll was drawn up in accordance with the 1906 Act.[12] On the other hand, it is also clear that an Osage Indian is more than merely someone of some Osage blood. Support for the conclusion that Congress did not use the terms "Osage Indian" and "person of Osage Indian blood" synonymously is provided not only by the express and repeated use of these two different terms within the same paragraphs of the 1978 Act but by the Technical Corrections Act of 1984, which substituted the phrase "not an Osage Indian" for the phrase "person not of Osage Indian blood" found in section 7 of the 1978 Act. 92 Stat. 1663. If the terms were synonymous, there would have been no need for the technical correction. Furthermore, if one is 1/32 Osage but has severed all ties with the tribe and is not listed on the census rolls, it makes little sense to require the Secretary's approval of such a person's will. In fact, there is no way that the Secretary would even know that the testator was 1/32 Osage if not so listed on the rolls of the tribe. The most natural reading of the 1978 will provision is that while anyone of Osage blood, who is of age, can make a will, only those who are considered Osage Indians must have the will approved. Although those of Osage blood who are not considered Osage Indians need not be subject to the approval provision, they are, however, subject to other provisions restricting alienation of Osage headrights and certain other property interests.
 
 
 26
 Given that the term Osage Indian requires more than just any quantum of Osage blood but less than enrollment as an original allottee, it was not legal error for the Osage Agency to exercise jurisdiction on the basis that Akers was "unallotted Osage."[13] Finding no legal error in the Osage Agency interpretation of the meaning of the term Osage Indian, nor any factual error in its prima facie determination that Akers fit the legal definition, we proceed to examine whether the Secretary's factual determination was rebutted by alleged evidence of Akers' enrollment as Pawnee. The specific question is whether evidence that the Pawnee Agency showed Akers as having some Pawnee blood precluded Akers' enrollment as Osage under Congressional enactments governing Osage Indians.
 
 
 27
 Evidence of a Pawnee Agency record of Akers' Pawnee blood does not undermine the evidence allowing the Secretary to conclude that Akers was an Osage Indian. Lone Elk's certificate of Indian blood filed with the Pawnee Agency and showing that Akers was "listed as 1/4 Pawnee, # 18" was never established to be evidence of Akers' enrollment as Pawnee. It establishes on its face no more than that the Pawnee Agency apparently had Akers on some kind of a list showing degrees of Pawnee blood for some undesignated purpose. Appellants themselves concede that Lone Elk's certificate of Indian blood did not indicate that Victor Akers was enrolled in the Pawnee tribe. Appellants' Reply Brief at 11. Furthermore, we cannot ascertain from Akers' own certificate of Indian blood, submitted to the federal court as additional evidence, that Akers was enrolled in the Pawnee tribe for federal will-approval purposes.[14] It is entirely possible to be both Osage and Pawnee for Indian purposes, i.e., each tribe could recognize Akers as a member for voting or other purposes. See F. Cohen Handbook of Federal Indian Law 137 (1942, reprinted by the University of New Mexico Press). See also F. Cohen Handbook of Federal Indian Law 23 (1982 ed.) ("Congress has the power to define membership differently from the tribe when necessary for administrative purposes.") Dual citizenship among Indian tribes was implicitly acknowledged in this circuit as far back as Mandler v. United States, 49 F.2d 201, reh'g denied, 52 F.2d 713 (10th Cir.1931). If Akers was carried for some Pawnee purpose on a Pawnee Agency record, that fact does not establish that he was not enrolled as Osage for purposes of will approval.[15] We conclude that the Secretary had substantial and even abundant evidence on the record to conclude that Akers was an Osage Indian for purposes of will approval. Evidence that Akers was listed with the Pawnee agency as having Pawnee blood does nothing to undermine the cumulative evidence that he was Osage for purposes of will approval.[16]
 
 II.
 
 28
 We turn next to the question of whether the Secretary was justified in finding that Akers had an insane delusion that materially affected the terms of the will. The basic standard for review of the Secretary's decision approving or disapproving an Osage will is found in the Osage Indian Act of 1978. In pertinent part, the Act provides that "[The Secretary's] decisions shall be binding and shall not be reversed unless the same is against the clear weight of the evidence or erroneous in law." 92 Stat. 1661, Sec. 5(a). Although this standard requires considerable deference to the decision of the Secretary, it gives somewhat more discretion to the courts than would review under an arbitrary and capricious standard, and perhaps even under abuse of discretion and substantial evidence standards. In any event, after reviewing the Secretary's factual findings and conclusions of law, we have no trouble determining that the Secretary's decision was both legally erroneous and against the clear weight of the evidence.
 
 
 29
 The sole evidence of an insane delusion was the contradiction between the Secretary's finding that Lone Elk was Akers' illegitimate son and the phrase in Akers' will stating "I have but two children and ... their names are Norman Akers and Vicki Akers Pratt." Appellants insist that these words did no more than reflect Akers' intention not to bequeath a share of his estate to Lone Elk. That intention was expressed as far back as the time of Ross's claim for child support in 1978. The Secretary argues that since Akers previously had acknowledged Lone Elk as his son, his words evidenced an insane delusion rather than any rational intent to disinherit.
 
 
 30
 The burden of proof to establish an insane delusion falls on the will contestant. See In re Holmes Estate, 270 P.2d 320, 321 (Okla.1954); see also Attocknie v. Udall, 261 F.Supp. 876, 882 (W.D.Okla.1966), rev'd on jurisdictional grounds, 390 F.2d 636 (10th Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 104, 21 L.Ed.2d 104 (1968). Where there is no extrinsic evidence to support a claim of insane delusion, the burden is not met. A determination that the testator had an insane delusion cannot arise solely from a phrase in a will recognizing only two of three previously acknowledged children. The Oklahoma cases do not argue otherwise, a fact that has eluded the Secretary.
 
 
 31
 The leading Oklahoma cases involving insane delusion are Winn v. Dolezal, 355 P.2d 859 (Okla.1960) and In re Robertson's Estate, 199 Okl. 582, 189 P.2d 615 (1948). Both involved testators whose wills did not acknowledge certain alleged children of the testators as their own. The children had been born while the testators were married to the children's mothers. In both cases, extrinsic evidence was offered to substantiate the existence of an insane delusion or its absence.
 
 
 32
 The Winn court summarized the meaning of an insane delusion under Oklahoma law as follows:
 
 
 33
 "An insane delusion may exist notwithstanding full mental capacity in other respects and the test as to validity of a will when contested upon the ground that testator was laboring under an insane delusion is not whether testator had general testamentary capacity, but whether an insane delusion materially affected the will. An insane delusion is a belief in things which do not exist, and which no rational mind would believe to exist. The essence of an insane delusion is that it has no basis in reason, cannot be dispelled by reason, and can be accounted for only as the product of mental disorder."
 
 
 34
 Winn, 355 P.2d at 861. In other words, the belief must be (1) false, (2) irrational, and (3) explainable only as the product of mental disorder. In Winn, the court found the evidence sufficient to support the testator's view that the children born during his marriage to their mother were fathered by another man. Therefore, they found no false belief and, a fortiori, no insane delusion reflected in his testamentary denial of paternity, which clearly was meant to be taken literally.[17]
 
 
 35
 On the other hand, in In re Robertson's Estate, 189 P.2d 615, (Okla.1948), it is more difficult to deduce whether the testator declined to acknowledge his children because he rationally wished to disinherit them or because he was insanely deluded into believing that they were not his. Robertson concerned an elderly testator who had married for the fourth time and was alleged to be under the influence of his fourth wife. He bequeathed only five dollars apiece to two grown children who were found to be the legitimate offspring of his first marriage. His will declared "I have no children ... [and] in event any person shall legally prove themselves to be my children, ... I leave them the sum of One Dollar." 189 P.2d at 617. A county court heard and apparently gave some credit to expert and lay testimony questioning Robertson's testamentary capacity in general. Although it found that Robertson was mentally competent to make a will and had not been unduly influenced by his fourth wife, it also found that the will was the product of an hallucination that he had no children. An Oklahoma district court reversed the finding of insane delusion, and the Oklahoma Supreme Court reversed the district court. In so doing, the supreme court found no rational basis for Robertson's intent to disinherit his own legitimate children, and it construed the language of the will literally as confirmation of an insane delusion.
 
 
 36
 Both Winn and Robertson were distinguished in Attocknie v. Udall, 261 F.Supp. 876, as cases concerning children born in wedlock. The reasoning of Attocknie is apposite here.[18] In Attocknie, a Comanche Indian stated in his will, "I leave nothing to Willis Attocknie because he is not my son." Although the Secretary of the Interior found that Willis was the illegitimate son of the testator, he nonetheless approved the will against claims that Attocknie was insanely deluded into believing that Willis was not his son. In upholding the Secretary, the federal district court found no authority for application of a rule that would find an insane delusion simply on the basis of the incongruity of the language of the will and actual evidence of paternity. 261 F.Supp. at 881. "[P]roof of a change of attitude [toward paternity] is not ... evidence of an insane delusion. Further, it is equally absurd to suggest that the inconsistency between the language in the will and the original findings of fact tends to prove an 'insane delusion.' " Id. at 882. The court then focused on the disputed evidence as to paternity and stressed that it could not determine that Attocknie truly had a false belief that Willis was not his son. Although upholding the Secretary's findings as to paternity under a substantial evidence standard, the court concluded that the paternity findings could be false or, even if true, not shared by the testator. Heavy emphasis was placed on the fact that where the child is illegitimate, some rational doubt as to paternity may linger.
 
 
 37
 In Akers' hearing, the evidence of paternity was not disputed. Nonetheless, and even if one concedes that the language of the will apparently evidenced a false belief that Lone Elk was not his son, we cannot determine that the belief defied rational explanation and could be explained only as the product of a mental disorder. On the contrary, the language can be read as evidence that Akers had changed his mind as to paternity and was now disputing it. No evidence other than that offered by Lone Elk's mother ever established that Akers was the father. The paternity affidavit, the birth certificate, and Lone Elk's certificate of Indian blood were all offered into evidence by Ross, and only the paternity affidavit bore Akers' alleged signature. Also, there is no evidence that a change of mind, if in fact there was one, was based on insane hatred, insane prejudice, or an unjustified sense of being wronged by the child who was disavowed. See In re Robertson's Estate, 189 P.2d at 617-18, quoting Rood, Wills 102, Sec. 137 (2d ed.) (suggesting that these are common grounds for finding a delusion that avoids a will). On the contrary, the evidence is to the effect that Akers continued to have a casual relationship with Lone Elk, seeing him and giving him small gifts occasionally. Furthermore, the will declared Akers' love and affection for Lone Elk. This evidence does not suggest crazed behavior on the subject of paternity; if anything, it tends to suggest that even if Akers doubted his paternity, he was not holding it against Lone Elk in ways other than not wishing him to share in his estate. Even the magistrate found that there was no extrinsic evidence of any mental derangement. R. Vol. I at 5 following tab 19.
 
 
 38
 Assuming arguendo that Akers had some doubt about paternity, we conclude that Lone Elk, the contestant of the will, did not meet his burden of proving that doubt as to paternity was irrational. See Attocknie v. Udall, 261 F.Supp. at 882 (contestant failed to prove false belief); In re Holmes Estate, 270 P.2d 320, 321 (Okla.1954) and In re Lillie's Estate, 195 Okl. 597, 159 P.2d 542, 544 (1945) (burden falls on contestants to prove lack of testamentary capacity).
 
 
 39
 Alternatively, and unlike the testator's words in Winn, Akers' words "I have but two children" cannot be determined to reflect a sincere denial of paternity of a third child; instead they are susceptible to the construction that they were simply invoked for the purpose of disinheriting one who might otherwise be judged a rightful heir. Significantly, they were common formula words, symbolic of an intent to disinherit for reasons other than an insane delusion. They were drafted by an attorney--the same attorney, in fact, who filed Ross' child support claim against Akers in 1977. Similar language in other wills has been interpreted by the Oklahoma courts as evidence of a clear intent to disinherit, although in the context of whether a child was a pretermitted heir rather than in the context of an allegation of insane delusion. See In re Estate of Hester, 671 P.2d 54 (Okla.1983) (statement that "I have no children" held to evidence intent to omit testator's natural son where fact that he had a son was undisputed); O'Neill v. Cox, 270 P.2d 663, (Okla.1954) (statement that "I have no children and have never had any children" held to express intent to disinherit legal son); Dilks v. Carson, 197 Okl. 128, 168 P.2d 1020 (1946) (statement that "I have no child nor children except William Dilks and Gladys Dilks ... and I do hereby exclude any and all other persons claiming to be my child...." held to express ambiguity regarding intent, allowing its interpretation in light of circumstances under which they were made; court then ruled that natural daughter had been deliberately excluded from will).
 
 
 40
 The Robertson case relied on so heavily by the Secretary ignored the Dilks case in which the testator had used language similar to that used in Robertson. Instead, the Robertson court commented: "That testator did believe the declaration [that he had no children] to be true is evidenced by the fact that he put that solemn declaration in the instrument itself." 189 P.2d at 618. Yet in post-Robertson cases, courts considering "omitted child" issues have concluded that the testator's language denying the existence of a child need not be construed literally. See generally, e.g., Hester, 671 P.2d 54; O'Neill, 270 P.2d 663. The Secretary's decision in Akers, construing the testator's language literally and finding an irrational contradiction between the language and previously acknowledged paternity, is not supported by this line of Oklahoma cases. We conclude that there is no sound reason for the Secretary to assume mechanically that the testamentary language must be read literally as soon as a contestant alleges an insane delusion.[19]
 
 
 41
 We see little difference between language denying paternity and omitting any reference to a previously acknowledged child and language denying paternity and then explicitly limiting the inheritance of a previously acknowledged child. While one is governed by rulings determining whether the child is a pretermitted heir and the other is not, the language denying paternity is frequently the same. Whether Akers considered Lone Elk to be his son or not is immaterial if the will evidences a clear intention not to leave him a share of the estate, and there is no other evidence suggesting the intention was based on an insane delusion.
 
 
 42
 Taken as a whole, the evidence utterly fails to suggest an insane delusion. Instead, the clauses in question evince a clear intent to preclude a possible claim by Lone Elk as a pretermitted child. He is mentioned specifically in the will but is not acknowledged as a child, anyone so claiming is given $5.00, and that is that. The Secretary's conclusions at every step are against the clear weight of the evidence. Furthermore, it is erroneous in law to find an insane delusion from nothing but the contradiction between a finding of paternity and testamentary language commonly used to preclude a pretermitted heir claim.
 
 
 43
 AFFIRMED IN PART AND REVERSED IN PART AND REMANDED WITH INSTRUCTIONS TO THE SECRETARY TO APPROVE THE WILL.
 
 
 
 [1]
 A will of an Osage Indian devising Osage mineral and other property interests with federally imposed restrictions on alienation falls under the Osage Indian Act of 1978, Pub.L. 95-496, 92 Stat. 1660, 1661 (1978), as amended. That statute requires the Secretary to approve the will prior to its probate in the Oklahoma courts. Under regulations implementing the will provision, the Osage Agency Superintendent is responsible for approving or disapproving the will. 25 C.F.R. Sec. 17.12. Under departmental policies, the decision of the Superintendent is appealable to the southwest Regional Solicitor for the Interior Department
 A will of a Pawnee Indian, on the other hand, is subject to 25 U.S.C. Sec. 373, whereby the Secretary of the Interior must approve wills devising interests in Indian trust allotments or federally restricted real estate. This will provision applies to all "persons" with the exception of "the Five Civilized Tribes or the Osage Indians." Regulations promulgated to implement this provision assign responsibility to an administrative law judge to review the will and probate it if approved. The decision of the administrative law judge is appealable to the Department's Board of Indian Appeals. 43 C.F.R. Sec. 4, subpt. D.
 Under either statute, the Secretary's actions can be reviewed in federal court after administrative remedies have been exhausted. The standard of judicial review is slightly different, however, under the two statutes. Under the Osage Indian Act, the Secretary's decision to approve or disapprove the will is subject to reversal in federal court if it is "clearly against the weight of the evidence or erroneous in law." 92 Stat. 1660, 1661. Review under the second statute, applicable to Pawnee Indians, is governed by the Administrative Procedures Act ("APA"). See Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970). Under the APA, the Secretary's decision to approve or disapprove the will is subject to reversal in federal court if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute; ..." 5 U.S.C. Sec. 706(2)(A) and (E).
 
 
 [2]
 No one challenged the authenticity of Akers' signature on the affidavit, in spite of the fact that Akers' alleged signature therein bears little resemblance, superficially at least, to the signature authenticated as his in his will. Lone Elk's mother testified that Akers, a periodic heavy drinker, signed the affidavit when he was sober; no cross-examination of her testimony was conducted
 
 
 [3]
 Notably, the attorney who represented Ross in her child support proceedings is the same attorney who drew Akers' will some six years later and who drafted the term of the will that stated "I have but two children." At the time the child support order was filed, Ross alleged that she was married to Akers, but no documentation establishing a marriage is in the record, and the attorney for Lone Elk never asserted that Ross had been legally married to Akers
 
 
 [4]
 The term "unallotted" refers to the fact that Akers was not among the original 1906 Osage "allottees" of Osage tribal land. See discussion at page 929
 
 
 [5]
 We take judicial notice of the fact that, as the uncontested holder of more than three headright interests and as the uncontested descendant of an original allottee (or allottees), Akers was entitled to vote in Osage tribal elections
 
 
 [6]
 At the bottom of Lone Elk's Certificate of Degree of Indian Blood filed with the Pawnee Agency, the name of Lone Elk's father is given as Victor Akers, followed by the phrase: "listed as 1/4 Pawnee, # 18." See Exh. 2 at Will Hearing before the Field Solicitor, June 19 and August 30, 1984. This was the extent of the record evidence available on appeal to suggest that Akers was not enrolled as an Osage Indian
 
 
 [7]
 Were we to accept section 5(a) of the Osage Indian Act of 1978 as creating the correct standard of review for the preliminary jurisdictional question, it would not change the outcome. Section 5(a) provides that decisions with respect to will approval are not to be reversed unless "against the clear weight of the evidence or erroneous in law." 92 Stat. 1662. The decision that Akers was Osage Indian was neither
 
 
 [8]
 H.R.Rep. No. 963, 92d Cong., 2d Sess. 2 (1972)
 
 
 [9]
 A rationale for such differentiated treatment could have been that by the time the first unallotted Osages reached the age of maturity in 1928, they would have been assimilated into American culture and would have been presumed competent to make a will devising restricted property without federal government review. Whether this was originally the presumption or not, it did not remain so. See footnote 10
 
 
 [10]
 F. Cohen, Handbook of Federal Indian Law 791, n. 195 (1982 ed.) supports the Secretary's view that they are: "For many years after 1906, the term 'members' of the Osage tribe meant only persons on the 1906 roll. After passage of the 1929 Act, the term came to include unenrolled Osages who succeeded to trust property.... [T]he term is now used to include all persons of Osage ancestry on BIA [Bureau of Indian Affairs] records."
 The 1929 statute makes clear that unallotted Osages were bound by the same restrictions on alienation as the original allottees, whether disposing of allotted lands and funds by will or otherwise. In other words, any notion that unallotted Osage would not be held to the federal restrictions because they were assimilated had been undermined by the 1929 provision. Although the will of an unallotted Osage still might not be subject to approval by the Secretary, previously existing restrictions on alienation could not be removed by the will of an unallotted Osage Indian.
 
 
 [11]
 See H.R.Rep. No. 1459, 95th Cong., 2d Sess. 4 (1978), stating that "the laws of the State of Oklahoma are applicable to all Osage Indians whether they are allotted or unallotted...." (emphasis added). See also the same report, describing the Osage Tribe as consisting of "9,205 persons of Osage blood who are carried on the Agency census records." Id. at 3
 
 
 [12]
 Further evidence that this is the correct conclusion is provided by section 7 of the 1978 Act, as amended by the Technical Corrections Act of 1984. 98 Stat. 3164. Section 7, as amended, prohibits any person who is not "an Osage Indian" from receiving more than a life estate in an Osage headright owned by an Osage Indian. The plain meaning is that if one is an Osage Indian, one may receive more than a life estate. If Osage Indians were limited to those on the 1908 roll, then as soon as all original enrollees had died (the youngest would have been seventy-one in 1978), there would be no Osage Indians left to inherit more than a life estate, and, thereafter, only life estates would be possible. The details of section 7, as amended, seem to contemplate no such result; on the contrary, they indicate that a headright held by a non-Osage shall vest first in designated Osage Indian remaindermen, then Osage Indian heirs, and only in the tribe itself if there are no remaindermen or heirs
 
 
 [13]
 There is no quarrel over whether or not Akers had Osage blood. Appellants acknowledged before the federal magistrate that Akers was the grandchild of an Osage allottee, thereby conceding that Akers had Osage blood and was not a non-Osage heir or devisee of Osage headright interests. R.Vol. II at 3
 
 
 [14]
 Akers' own certificate was not entered into the administrative record but was only submitted afterwards to federal district court. Since it goes to the question of Osage Agency jurisdiction over Akers' will, it can be accepted as collateral evidence not originally entered into the administrative record. It does no more, however, than confirm what Lone Elk's certificate indicated, i.e., that Victor Akers was listed with the Pawnee Agency as 1/4 Pawnee. The form shows Akers as having an identification number (but, significantly, not an enrollment number) of 0018. Supplemental Vol. I at 10
 
 
 [15]
 In fact, there is evidence in the record that dual Interior Department Indian records are kept for dual purposes. A "marriage card" at the Bureau of Indian Affairs ("BIA") showed only Lone Elk's Osage and Otoe-Missouria bloodlines from his mother and, in the column entitled "Census or Allotment No.," showed him as "Enrolled 1-281980 unalot. [unallotted]." Presumably, he was enrolled as either Osage or Otoe-Missouria or both. Yet, Lone Elk also has a "Certificate of Degree of Indian Blood" filed with the Pawnee Agency showing him as part Pawnee and part Otoe-Missouria, reflecting information on the form that both his mother and father were part Pawnee but not reflecting either parent's Osage blood. In other words, BIA records show that Lone Elk was both Osage and Pawnee, yet the Pawnee Agency certificate shows no Osage blood, while the marriage card shows no Pawnee blood. The marriage card supports the conclusion that his certificate filed with the Pawnee Agency apparently did not preclude his enrollment on BIA records as an Indian of another tribe. Logically, the same result could obtain for Victor Akers
 
 
 [16]
 If the evidence had established conclusively that Akers was legally enrolled as both Osage and Pawnee, the question would have arisen as to which tribal enrollment Congress would recognize for will approval purposes. It has long been recognized that Congress can designate single membership for its own legal purposes even when dual membership has been established for Indian purposes. With respect to allotment and other distribution of tribal property or federal benefits, it is "well established policy" that a "person cannot be a member of two tribes at once." F. Cohen, Handbook of Federal Indian Law 137 (1942, reprinted by the University of New Mexico Press). Arguably, will approval is in the nature of a protective benefit, and it makes sense to suppose that the Secretary would want a dually enrolled Indian to fall under one will-approval process or the other rather than be subject to multiple and possibly conflicting review and probate procedures. We need not decide this issue, however, because the record does not establish that Akers was, in fact, dually enrolled
 
 
 [17]
 The testator's will stated that "the above named children are to receive nothing further from my estate; said children were born to my said former wife during the time that I and she were husband and wife, but which said children I am not the father of and do not acknowledge either of them as being my children; however in any event said above named children are to be fully bound by the above provisions herein made for them, and in the event they are [sic] either of them, should attempt to contest this Will or the provisions so made for them, then and in that event said contesting person or persons shall receive nothing from my estate." Winn, 355 P.2d at 860-61
 
 
 [18]
 Attocknie was reversed on the grounds that the federal court lacked jurisdiction under 25 U.S.C. Sec. 373 to review the Secretary's decision. 390 F.2d 636 (10th Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 104, 21 L.Ed.2d 104 (1968). The effect of the reversal on the Secretary's decision was the same as the ruling of the district court: the Secretary's decision to approve the will was valid. Two years later, the Supreme Court took certiorari in the case of Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970), and held that the federal courts had jurisdiction to review the Secretary's decisions under 25 U.S.C. Sec. 373
 
 
 [19]
 While a literal construction might have the salutary effect of requiring testators to more openly and directly disinherit a child rather than doing it by denying paternity, such is not required by the law of Oklahoma