In the Matter of the ESTATE OF Mae LITTLE BEAR, Deceased.

Sophia Little Bear OVERTON, now Dahlberg and Hayesenne Little Bear Dunlap, now Haskins, Appellants,

v.

Bruce GAMBILL, Executor of the Estate of Mae Little Bear, Deceased; Leon Edward Stansifer and Lonnie Calvin Stansifer, Appellees.

No. 77005.

Supreme Court of Oklahoma.

Dec. 5, 1995.

**44**

Kent P. Sullivan, Leach, Sullivan, Sullivan, & Green, Duncan, for Appellants.

Bruce W. Gambill, Gambill & Associates, Pawhuska, for Appellees.

LAVENDER, Justice.

We decide whether the Osage Tribe of Indians Technical Corrections Act of 1984, Pub.L. No. 98–605, 98 Stat. 3163 (1984 Act), was intended by Congress to prohibit a non-Indian devisee from receiving more than a life estate in a headright devised to such devisee by the will of a non-Indian devisor, who owned the full beneficial interest in the headright at the time of death? We hold the 1984 Act, which amended the Act of October 21, 1978, Pub.L. No. 95–496, 92 Stat. 1660 (1978 Act), was not so intended and the devise of the full beneficial interest in a headright interest to two non-Indian nephews by a non-Indian who owned the full beneficial interest in the headright at the time of death was valid.

## FACTS AND PROCEDURAL HISTORY

In 1906 Congress passed the Osage Allotment Act of June 28, 1906, 34 Stat. 539 (1906 Act), which in part, divided about one and a half million acres of land among the 2,229 individual members of the Osage Tribe of Indians with certain restrictions. *Matter of Estate of Tayrien,* 609 P.2d 752, 754 (Okla. 1980). Essentially, the land consisted of the Osage reservation in Oklahoma, which had been purchased from the Cherokees. *Id.* The 1906 Act also placed in trust for the benefit and use of the Osage Tribe the mineral interest for these lands. *Id.* The trust period was originally set at twenty-five years, it was extended several times and by the Act of October 6, 1964, Pub.L. No. 88–632, 78 Stat. 1008, the minerals were reserved for an indefinite period. *Matter of Estate of Tayrien,* 609 P.2d at 754. Subsection 2(a) of the 1978 Act extended the trust period "in perpetuity". FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 788–789 f.n. 174 (1982 ed.) (hereafter COHEN).

In addition to mineral income, the trust set up by the 1906 Act contained monies which the United States held in trust for the Osage which had been received under various treaties as compensation for the re-

linquishment of certain Osage lands. *Matter of Estate of Tayrien*, 609 P.2d at 754. The 1906 Act further provided that all funds due the Osage Tribe would be credited to the individual members of the Tribe on the basis of a pro rata division among the members or their heirs. *Eckelt v. Herrell*, 783 P.2d 1, 1–2 f.n. 1 (Okla.Ct.App.Div. 1, 1989) (Approved for Publication by Order of the Supreme Court). This pro rata interest in the trust fund came to be known as a headright. *Id.* A headright has been defined several times, but basically consists of (1) the right to receive at the end of the trust period trust funds arising largely from the mineral income, and (2) the right to participate during the trust period in the distribution of bonuses and royalties arising from the mineral estate plus accrued interest on the trust fund. *Id.*; *Matter of Estate of Tayrien*, 609 P.2d at 754–755. The 1984 Act contains a specific definition of the term "headright" for purposes of the 1984 Act, which is as follows: "any right of any person to share in any royalties, rents, sales, or bonuses arising from the Osage mineral estate." 1984 Act, subsection 11(2). As set out by COHEN, *supra*, at 791, "[m]ost persons of Osage Indian ancestry own no headrights and thus receive no tribal income.... Some persons own more than one headright, or own fractional shares of headrights, and some headrights are owned by non-Osages." This state of affairs is a result of succession to headrights by inheritance and devise. *Id.* at 791 f.n. 196.

This case concerns answering the question, in light of the 1984 Act, who is currently entitled to the headright interests that were at one time owned by Hayes Little Bear (Hayes), an original Osage allottee under the 1906 Act? Specifically, the appeal is from the probate of the estate of Mae Little Bear (Mae). Appellants, Sophia Little Bear Overton, now Dahlberg and Hayesenne Little

Bear Dunlap, now Haskins, objected to the petition to approve final account, determine heirship and the order distributing the assets of Mae's estate arguing Mae's devise of headright interest owned by her to two non-Indian nephews was violative of federal law. The objection was presented to the trial court based on the parties' written stipulation of facts and the testimony of one witness, Cecil O. Wood, Jr., a former Field Solicitor for the Bureau of Indian Affairs, United States Department of the Interior, stationed at the Osage Indian Agency.[1] Except where indicated the following is taken from the stipulated facts.

Hayes, an allotted Osage Indian, of ⅝ths Osage Indian blood married Mae in November 1934. Hayes and Mae had no children together, but Hayes had three children from previous wives-appellants and a son, Harold Little Bear. Hayes died testate in 1946. His estate included 2.666 (2⅔rds) Osage headrights. By virtue of his will the headright interests were distributed as follows: 1.666 (1⅔rds) to Mae and .50 (½) each to appellants, Hayes' two daughters. Mae had no Indian blood and was caucasian. Appellants are Osage Indians of ⁵⁄₁₆ths Osage Indian blood. The Last Will and Testament of Hayes, containing the above distribution of Hayes' headright interests, was approved by the Secretary of Interior. The record also shows the above distribution of Hayes' headright interest to Mae and appellants was approved by the County Court of Osage County, Oklahoma by an Order Approving Final Account, Determination of Heirs and Distribution of Estate filed March 18, 1948 in Case No. 5293, In the Matter of the Estate of Hayes Little Bear, Osage Allottee No. 433, Deceased.[2]

At the time of his death the above County Court, in the same Order, also determined

1. An affidavit of a William Haney, a Special Attorney Solicitor for the Bureau of Indian Affairs, Osage Agency, dated July 11, 1989, was also submitted. The affidavit concerned the estates of a Thomas L. Red Leaf, a non-Osage Indian and his wife, Winnie B. Red Leaf, a non-Indian. Apparently the affidavit was presented to back up the live testimony of the former Field Solicitor as to the departmental interpretation of pertinent Congressional Acts.

2. A copy of the March 18, 1948 Order Approving Final Account, Determination of Heirs and Distribution of Estate was attached to the parties' stipulation of facts. The contents of Hayes' Last Will and Testament was recited in this Order. According to the will Hayes did not leave any headright interest to Harold, his son, because Harold had previously inherited ⅔rds Osage headright interest, presumably from another source.

the heirs at law of Hayes to be: Mae, his surviving wife; Harold, his surviving son; and the appellants, his surviving daughters. The only heirs at law of Hayes currently alive who are of Osage Indian blood are appellants and Bena Little Bear Broussard and Patricia Little Bear Kinney, children of Hayes' son Harold, who died in 1981. Bena and Patricia are 13/32nd Osage Indian blood.

Mae died testate in July 1988, while a resident of Pawhuska, Oklahoma, owning the full beneficial interest in 1.25 (1¼th) Osage Headrights, having previously transferred .4166 headright during her lifetime, which is not involved in this case. By her will, Mae devised the 1.25 headrights to appellees, Leon Edward Stansifer and Lonnie Calvin Stansifer—her nephews and brother's children.[3] Each nephew is caucasian, with no Indian blood. Mae died with no heirs at law of any Osage Indian blood or any Indian blood. Appellants received $5.00 each under Mae's will, an explanatory clause stating: "no greater provision for them [was made] because their father [Hayes] made ample provision for them at his death." Mae's will has not been approved by the Secretary of the Interior. No first right of purchase was offered to appellants of the headright owned by Mae at her death.

As noted, Cecil O. Wood, Jr. testified at the hearing on appellants' contest of Mae's will. Prior to his retirement in December of 1989, Mr. Wood was the Field Solicitor for the United States Bureau of Indian Affairs, a part of the United States Department of Interior, stationed at the Osage Indian Agency. He had been stationed at the Osage Agency for thirty (30) years prior to his retirement and had been Field Solicitor there for almost twenty (20) years. He testified that in this capacity he assisted in drafting the 1978 and 1984 Acts. In substance, Mr. Wood testified that the departmental interpretation of the Acts was that neither limited a non-Indian to only a life estate when the headright interest was devised to such devisee by the will of a non-Indian who, like Mae, owned the full headright interest. He also testified, in substance, that although the 1984 Act did require approval of the Secretary of Interior for an *inter vivos* transfer of a headright owned by a non-Indian and, in the case of an *inter vivos* transfer by a non-Indian, a right of first purchase was given to certain Osage Indian heirs (here including appellants), neither Act required Secretary approval or afforded a right of first purchase when a non-Indian owner, like Mae, who lawfully owned the full headright interest, devised the headright to a non-Indian by will.

Based on the parties' stipulations, the other evidence presented and his interpretation of the Acts, the trial court ordered distribution in equal shares to appellees. He ruled neither Act prohibited or limited the devise by will to Mae's non-Indian nephews. He also appeared to determine that if the 1984 Act was interpreted to have been intended to prohibit the devise, the Act would be unconstitutional as applied to non-Indians because it would divest the estate of the headright without compensation.[4] The Court of Appeals affirmed, in essence ruling that because Mae's ownership of the headright was lawful, having been properly devised to her by Hayes' approved will, what had been Osage Indian property subject to the control of

3. The other appellee in this appeal is Bruce Gambill, the executor of Mae's estate. We also note that we refer to the will's disposition of the headright interest as a devise because we have held that until such time as the holder of a headright receives a distribution (normally quarterly) from the trust estate, a headright being an interest in unaccrued royalties from mineral interests is an interest in land and, thus, an interest in real property. *Estate of Shelton v. Oklahoma Tax Commission*, 544 P.2d 495, 497–498 (Okla. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976), *reh. denied*, 429 U.S. 874, 97 S.Ct. 193, 50 L.Ed.2d 156 (1976).

4. In view of our decision that neither the 1978 or 1984 Acts were intended to prohibit a devise of

more than a life estate to a non-Indian when the headright was devised by the will of a non-Indian, like Mae, we need not decide any constitutional issue in this case. We do note, however, that in *In Re Smith's Estate*, 188 Okla. 158, 107 P.2d 188 (1940), this Court held that the prospect of inheritance does not constitute a vested right and Congressional regulation prohibiting inheritance by persons not of Indian blood from those of one-half or more Osage Indian blood, except spouses of existing marriages, did not contravene constitutional requirements of due process or equal protection of the law secured by the Fifth Amendment to the United States Constitution.

Congress when owned by Hayes was no longer subject to such control after Hayes had lawfully devised the headright interest to Mae, a non-Indian. The Court of Appeals said, "[Mae's] vested ownership of the headright, in effect, "severed" it from being under control of either the 1978 Act or the 1984 Act." We granted certiorari to decide the applicability of the 1984 Act to the devise at issue, a question we deem one of first impression.

Appellants' contentions can be boiled down to these: 1) the 1984 Act restricted a non-Indian from receiving more than a life estate in a headright, whether the headright interest was devised by will or transferred by some other method, and regardless of whether the devisor or transferor was a non-Indian, like Mae, who lawfully owned the full beneficial interest in the headright at the time of death; 2) in that Mae's will did not limit the devise to her non-Indian nephews to a life estate, the devise is void; and 3) appellants are entitled under the 1984 Act to the headright upon payment to Mae's estate of the fair market value of the headright interest. Appellants rely on what they say is the plain language of the 1984 Act to support their position. In our view, appellants misread the 1978 and 1984 Acts. Before discussing these two most recent Acts we set forth the historical treatment Congress afforded headrights in the hands of Osage Indians and non-Indians.

### HISTORICAL ANALYSIS

Under the 1906 Act Osage Indians were not allowed to alienate their headright interest. *Taylor v. Tayrien,* 51 F.2d 884 (10th Cir.1931), *cert. denied,* 284 U.S. 672, 52 S.Ct. 127, 76 L.Ed. 569 (1931); *See also Brenner v. Musgrove,* 168 Okla. 247, 32 P.2d 740, 742 (1934) (headright interest of Osage Indian cannot be sold, alienated or incumbered during his lifetime). The consistent position of the United States Department of the Interior has been that an Osage Indian may not transfer his or her headright interest *inter vivos.* 63 Interior Dec. 205 (July 20, 1956); 2 Opinions of the Solicitor, Dept. of the Interior, Indian Affairs 1437 (Feb. 13, 1947); *See also* COHEN, *supra,* at 791 (headrights

owned by Indians may not be alienated *inter vivos* ). In view of the prohibition on *inter vivos* transfer this Court and the United States Court of Appeals for the Tenth Circuit have disallowed attempts by those seeking to gain control of the headright interest and/or future funds flowing therefrom to gain such control when the beneficial interest in the headright was owned by an Osage Indian. *Taylor v. Tayrien, supra* (disallowed appropriation of headright by Osage Indian's bankruptcy trustee); *Tucker v. Brown,* 185 Okla. 234, 90 P.2d 1071 (1938) (disallowed attempt by creditors to acquire income from headright of deceased Osage); *Brenner v. Musgrove, supra* (judgment creditor of Osage Indian not entitled to appointment of receiver to sell Osage allottee's headright or collect income accruing thereto for application of proceeds to pay judgment).

Devise of a headright by the will of an Osage Indian was not treated the same by Congress as an *inter vivos* transfer. By the Act of April 18, 1912, ch. 83, 37 Stat. 86 (1912 Act) Congress allowed an Osage Indian to dispose of a headright by will. *See Akers v. Hodel,* 871 F.2d 924, 930 (10th Cir.1989). Section 8 of the 1912 Act provided;

> That any adult member of the Osage Tribe of Indians not mentally incompetent may dispose of any or all of his estate, real, personal, or mixed, including trust funds, from which restrictions as to alienation have not been removed by will, in accordance with the laws of the State of Oklahoma: *Provided,* That no such will shall be admitted to probate or have any validity unless approved before or after the death of the testator by the Secretary of the Interior. (Italics in original)

There was no restriction in § 8 of the 1912 Act as to devise to non-Indians.

As to intestate succession, under § 6 of the 1906 Act the lands, moneys and mineral interests of deceased members of the Osage Tribe descended to his or her legal heirs according to the laws of the Territory of Oklahoma and, upon Statehood, the laws of the State of Oklahoma. Thus, under the 1906 Act a headright interest could pass to non-Indians by the law of intestate succession. However, by the Act of February 27,

1925, 43 Stat. 1008 (1925 Act), Congress did restrict inheritance by non-Indians where the decedent owning the headright was one-half or more Osage Indian blood. Section 7 of the 1925 Act provided:

> Hereafter none but heirs of Indian blood shall inherit from those who are of one-half or more Indian blood of the Osage Tribe of Indians any right, title, or interest to any restricted lands, moneys, or mineral interests of the Osage Tribe: *Provided,* That this section shall not apply to spouses under existing marriages. (Italics in original) [5]

Judicial interpretation of the 1925 Act made clear the provision applied to intestate succession only and did not control passage of Osage held property under a valid will. In *In Re Thompson's Estate,* 179 Okla. 240, 65 P.2d 442, 447 (1937), *cert. denied,* 302 U.S. 718, 58 S.Ct. 38, 82 L.Ed. 554 (1937), this Court said, "[in the 1925 Act] the word 'heirs' is used in the sense usually accorded it in American law and as meaning those persons upon whom the devolution of the property of an intestate is cast by operation of law[ ]."

As can be seen from the above discussion, although *inter vivos* alienation of a headright by an Osage Indian was not allowed, non-Indians came to own headright interests by virtue of disposition by will under the 1912 Act and in certain situations by intestate succession under the 1906 and 1925 Acts. COHEN, *supra,* at 791–792. It is under the 1912 Act that Mae, in 1948, lawfully received her headright interest from Hayes, her deceased husband, under his approved will.

In contrast to headright interests owned by Osage Indians, headright interests lawfully coming to be owned by non-Indians under the 1906, 1912 or 1925 Acts were treated differently by Congress. *Inter vivos* transfer by non-Indians was expressly allowed by the Act of April 12, 1924, 43 Stat. 94 (1924 Act), with Secretary of Interior approval. *In*

*Re Irwin,* 60 F.2d 495 (10th Cir.1932) (non-Indian wife's interest in Osage headright acquired under will of Osage husband passed to her bankruptcy trustee because Congress expressly provided that such headrights may be transferred when they are the property of those not of Indian blood); *Cook v. First National Bank of Pawhuska,* 145 Okla. 5, 291 P. 43 (1930) (non-Indian who inherited headright from Osage wife takes it without restriction and Secretary of Interior without authority to require non-Indian to give portion of proceeds from headright to minor Indian children as condition for approval of sale); *See also Eckelt v. Herrell, supra,* 783 P.2d at 2–3 (proceeds from headright owned by non-Indian subject to garnishment).

*Cook* makes clear the requirement for Secretary approval as to transfer by a non-Indian was not meant to give the Secretary the power to substantively restrict or control the transfer, but was merely intended to assist the Secretary, who was responsible for distribution of payments to the beneficial owners of the trust, in carrying out his responsibilities to insure the true beneficial owners were paid the proceeds from the headright interest. We said in such regard in *Cook:*

> The government has no policy of supervising [non-Indians] in their commercial transactions, has no policy to restrain its citizens from free and full activity in barter and trade. Unless it was the clear intent of Congress to adopt a policy of restricting the citizens of the United States in barter and trade, no such intent will be presumed. Inasmuch as the Secretary of the Interior has the responsibility to execute the Osage trust fund, it would greatly complicate the work in its management and the distribution of the profits therefrom as by law provided and required to allow the beneficial interest holders thereof to sell and dispose of them without advising him and

---

5. The 1925 Act was amended in 1950 by the Act of September 1, 1950, 64 Stat. 572.

The amendment basically provided that to be recognized as an heir having Indian blood for purposes of inheritance the claimant had to establish he or she was a citizen of the United States and enrollment on the membership, census, or other roll prepared under direction of the

Secretary of Interior, or that the person claiming to be an heir of Indian blood had a lineal Indian ancestor so enrolled. The amendment also made clear that the exception for spouses of existing marriages applied only to marriages existing on February 27, 1925, i.e. the date of enactment of the 1925 Act.

permitting him to make a record thereof. The Secretary of the Interior was specifically empowered to make rules and regulations affecting the sale and transfer of these beneficial interests by those who had the unrestricted right to make sale thereof. Even in corporations it is customary to require that assignments of stock be registered with the corporation to be binding on the corporation. (citations omitted)

291 P. at 46.

As to devise by will we have found no Act of Congress prior to the 1978 and 1984 Acts in dispute, and appellants have cited none, which prohibited a non-Indian lawfully owning a headright interest from passing it to a non-Indian by such method. We have also found no Act, and appellants have cited none, which prohibited a headright from passage by the laws of intestate succession in the case of non-Indians to their non-Indian heirs. It is, thus, seen that historically Congress has treated markedly different the ability of an Osage Indian to dispose of a headright with that of a non-Indian. Historically, as shown above, Osage Indians were always somehow restricted in their ability to dispose of a headright, whereas non-Indians have faced no restrictions when devising by will, passage by the law of intestate succession, or *inter vivos* transfer, except as to the latter a procedural requirement for Secretary approval. With this historical background we turn to a discussion of the 1978 and 1984 Acts to decide in what manner they were meant to change this previous treatment.

### 1978 ACT

■ Of course, we start with the understanding that the primary goal of statutory construction is to ascertain and follow the intention of the Legislature. *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Commission*, 764 P.2d 172, 179 (Okla. 1988). With this primary goal in mind we move to deciding the meaning of the 1978 and 1984 Acts, the former first.

The 1978 Act, which the 1984 Act amended, did change the law concerning disposition of Osage headrights, whether owned by Osage Indians or non-Indians. As pertinent here the major changes are found in §§ 7

and 8 of the 1978 Act. Section 7 of the 1978 Act, provides:

After passage of this Act, **a person not of Osage Indian blood,** except a child legally adopted by an Osage Indian in any court of competent jurisdiction and the lineal descendants of such adopted child, subject to the stipulation that such adopted child or his lineal descendants cannot alienate his Osage headright or mineral interest and the devolution thereof is limited to intestacy, will, or inter vivos trust the same as if he were of Osage Indian blood, **is prohibited from receiving more than a life estate in an Osage headright interest owned by an Osage Indian,** such adopted child or his lineal descendants, whether such interest is received by will, inter vivos trust, or Oklahoma law of intestate succession. Upon the death of such recipient, the Osage headright or mineral interest shall vest in the remaindermen thereof who are of Osage Indian blood, adopted children, and/or lineal descendants of such adopted children designated by the will or inter vivos trust of the deceased Osage Indian, his adopted child, or the lineal descendants of such adopted child. If such instrument does not designate remaindermen thereof who are of Osage Indian blood, adopted children, and/or lineal descendants of such adopted children, or if the deceased died intestate, the Osage headright or mineral interest shall vest in his heirs pursuant to the Oklahoma law of intestate succession, subject to the above limitations. On the death of the non-Osage beneficiary or heir, except in the case of adopted children or lineal descendants of such adopted children, such Osage headright or mineral interest shall vest in the Osage Tribe and the Tribe shall pay the estate of the non-Osage beneficiary or heir the market value of such Osage headright or mineral interest. Payments under this section shall be made from Osage tribal mineral funds authorized to be expended by section 8(b) hereof. (emphasis added)

■ As we read § 7, its own plain terms prohibits receipt of more than a life estate by non-Osage Indians **only** in situations where the headright being transferred by will, *inter*

*vivos* trust or intestate succession is owned by an **Osage Indian**.[6] Nothing in the provision indicates it was meant to restrict the receipt by a non-Indian of the full interest in a headright that was devised by the will of a non-Indian, like Mae, who lawfully acquired the full beneficial interest in a headright thirty (30) years prior to passage of the 1978 Act. As appellants have pointed out to us, when the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction beyond the statute itself. *In Re Martin's Estate*, 183 Okla. 177, 80 P.2d 561, 563–564 (1938). We see nothing ambiguous concerning § 7.[7]

■ Consistent with what we believe to be the plain language of § 7 of the 1978 Act is the interpretation of the Department of the Interior, as testified to by Mr. Wood, the former Field Solicitor for the Bureau of Indian Affairs at the Osage Indian Agency. That interpretation is that § 7 of the 1978 Act does not apply to the devise of a headright interest by the will of a non-Indian who lawfully owns, at the time of death, the full beneficial interest in a headright, like Mae. This contemporaneous construction of the executive officers charged with administering the provisions of the Act is entitled to great respect by the courts, although it is, of course, not controlling. *In Re Pryor's Estate*, 199 Okla. 17, 181 P.2d 979, 983–984 (1947), *cert. denied* 332 U.S. 816, 68 S.Ct. 155, 92 L.Ed. 393 (1947). We agree with the executive interpretation.

■ Notwithstanding the above discussion with regard to § 7 we acknowledge that there is one subsection of the 1978 Act that creates the potential for some ambiguity with regard to the applicability of § 7. This is subsection 5(d) of the 1978 Act which provides: "[n]otwithstanding the provisions of subsections (a), (b), and (c) of [ ] section [5], disposition of any Osage headright or mineral interest shall be subject to the provisions of section 7 of this Act." Although 5(d) is not expressly limited to dispositions by Osage Indians, in our view, read in context, 5(d) can only be a limitation on dispositions involving headright interest owned by an **Osage Indian**. The words, phrases and sentences of a statute are to be understood as used, not in any abstract sense. *State ex rel. Rucker v. Tapp*, 380 P.2d 260, 264 (Okla.1963). Words used in a part of a statute must be interpreted in light of their context and understood in a sense which best harmonizes with all other parts of the statute. *Id.* A review of subsections 5(a), (b) and (c) and the legislative history to the 1978 Act show beyond doubt that § 7 was meant to apply only to dispositions by Osage Indians and subsection 5(d) was not intended to alter this limitation as to the scope of § 7.

Section 5(a) provides in pertinent part:

Section 8 of the Act of April 18, 1912 (37 Stat. 86, 88) is hereby amended to read as follows: "Any person **of Osage Indian blood**, eighteen years of age or older, may dispose of his Osage headright or mineral interest and the remainder of his estate (real, person[al], and mixed, including trust

---

**6.** The rules in § 7 concerning adopted children of Osage Indians or their lineal descendants are not applicable to our present situation, so we need not concern ourselves with them. We do note, however, that § 10 of the 1984 Act provides the following:

> Except where any provision of this Act explicitly provides otherwise, wherever the term 'Osage Indian' is used in this Act, such term shall be construed so as to include any child who has been adopted by an Osage Indian (pursuant to the decision of any court of competent jurisdiction) and any lineal descendent of such child.

**7.** We note that subsection 6(a) of the 1978 Act is the provision that allows, with Secretary approval, any person of **Osage Indian blood** eighteen years of age or older to establish an *inter vivos*

trust covering his headright or mineral interest mentioned in § 7. The legislative history to the 1978 Act clearly explains that this provision concerning allowing an **Osage Indian** to establish an *inter vivos* trust was meant to create a mechanism for a will substitute so that an **Osage Indian,** prior to his death, could firmly establish the disposition that would be made of his or her property at death. *See* H.R.Rep. No. 1459, 95th Cong., 2d Sess. 4 (1978); FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 792 f.n. 200 (1982 ed.). The purpose was to avoid what had been a history of costly Osage will contests. *Id.* Subsection 6(a), as with § 7, does not indicate it would apply in the present situation where the owner of the headright is a non-Indian, like Mae.

funds) from which restrictions against alienation have not been removed by will executed in accordance with the laws of the State of Oklahoma: *Provided,* That the will of any **Osage Indian** shall not be admitted to probate or have any validity unless approved after the death of the testator by the Secretary of the Interior." (Italics in original) (emphasis added)

As seen, subsection 5(a) nowhere concerns itself with disposition by will when a headright interest is owned by a non-Indian. It is facially concerned **only** with the will of an **Osage Indian.** Subsection 5(a) of the 1978 Act goes on to provide procedures to be used for hearing before the Secretary at the Osage Indian Agency in Pawhuska, Oklahoma, when deciding whether to approve such a will (**i.e. the will of an Osage Indian**) and for exclusive jurisdiction in Federal court of all contests to the probate of a will approved by the Secretary. In order to carry out the responsibilities in regard to Secretary approval of an **Osage Indian will** the Department of the Interior has promulgated rules concerning pertinent procedures to be followed in such matters. *See* Action on Wills of Osage Indians, 25 C.F.R. §§ 17.1–17.14 (1995). Our research has not revealed the existence of any similar administrative rules or procedures in regard to the wills of non-Indians owning a headright interest nor the grant of statutory authority for the promulgation of such rules as to non-Indian wills.

Subsection 5(b) of the 1978 Act is an amendment to § 3 of the 1912 Act and provides that the property of deceased and of orphan minor, insane, or other incompetent **Osage Indians,** in probate matters, be subject to the jurisdiction of the district courts of Oklahoma. Certain duties are placed upon the Superintendent of the Osage Agency or the Secretary of Interior to investigate the conduct of executors, administrators, guardians or other persons having charge of the estate of such **Osage Indian** and to insure that the estate is not being wrongfully dissipated by those in control of the estate. The provision also provides that no guardian shall be appointed for a minor whose parents are living unless the minor's estate is being wasted or misused by the parents and that no land shall be sold or alienated under the subsection unless approved by the Secretary. As with subsection 5(a) the provision nowhere concerns itself with the treatment given to a headright interest lawfully owned by a non-Indian, and like 5(a) subsection 5(b) is concerned solely with the estates and property of **Osage Indians.**

The next subsection referred to in 5(d) is 5(c)[8]—an amendment to § 7 of the 1925 Act. Subsection 5(c) provides: "[h]ereafter none but heirs of Indian blood and children legally adopted by a court of competent jurisdiction and parents, Indian or non-Indian, shall inherit from **Osage Indians** any right, title, or interest to any restricted land, moneys, or Osage headright or mineral interest." (emphasis added) In plain language 5(c) is limited to inheritance of property owned by an **Osage Indian.** Although non-Indians are, of course, covered in the subsection it is only in the context that in certain situations they may actually inherit from an Osage Indian, i.e. children legally adopted and parents of such an Osage Indian.

Thus, subsections 5(a), (b) and (c) are all concerned exclusively with disposition by **Osage Indians,** not with dispositions by non-Indians, like Mae. Read in this context, subsection 5(d) is merely a statement that notwithstanding the allowance for devise by will, intestate succession, or control of the property of deceased, minor or incompetent Osage Indians by the district courts in Oklahoma, all dispositions of headrights **owned by Osage Indians** are subject to the strictures contained in § 7, i.e. in any disposition of a headright **owned by an Osage Indian,** a non-Osage Indian can receive no more than a life estate in the headright.

▮ If reading subsection 5(d) in such context does not clear up any potential ambiguity, a review of the legislative history to the 1978 Act does so. A court may examine the history of legislation in a case where a statute is ambiguous. *In Re Martin's Es-*

---

**8.** The subsection was misidentified as § 5(7), rather than § 5(c), in the 1978 Act. This mistake was corrected in the 1984 Act.

*tate, supra,* 80 P.2d at 563. Further, although a canon of construction in Indian law is that doubtful or ambiguous statutory provisions should be construed for the benefit of the Indians, legislative history may be resorted to in order to clear up doubt and to determine legislative intent. *Matter of Estate of Shunkamolah,* 800 P.2d 1079, 1080–1081 (Okla.Ct.App., Div. 1, 1990) (resort to legislative history appropriate to decide whether 1978 Act was meant to divest Oklahoma District Courts of jurisdiction over Osage Indian probate matters).

When one reviews the legislative history to the 1978 Act the meaning of Congress as to the applicability and reach of § 7 becomes clear. In H.R.Rep. No. 1459, 95th Cong., 2d Sess. 4–5 (1978), the following is said concerning § 7 of the 1978 Act by the Committee on Interior and Insular Affairs:

> Section 7 of the bill is intended to provide a means of keeping the Osage headright or mineral interest in Osage Indian ownership. There is no similar provision in existing law with regard to the Osages. This section would prohibit a person of non-Osage Indian blood from receiving more than a life estate in a[n] Osage headright interest **owned by an Osage Indian,** whether such interest is received by will, inter vivos trust, or Oklahoma law of intestate succession. Upon the death of such non-Osage recipient, the Osage headright would vest in the remaindermen of Osage Indian blood, **or if the deceased Osage died intestate,** the Osage headright would vest in his heirs of Osage Indian blood pursuant to the Oklahoma law of intestate succession. (emphasis added)

In S.Rep. No. 1157, 95th Cong., 2d Sess. 16 (1978), is found the following, which is an expression of the view of the United States Department of the Interior, Office of the Secretary, on the meaning of the then pending legislation:

> [Section 7] is intended to provide a means of keeping the Osage headright or mineral interest in Osage Indian ownership. There is no similar provision in existing law with regard to the Osages.
>
> This section would prohibit a person of non-Osage Indian blood from receiving more than a life estate in an Osage headright interest **owned by an Osage Indian,** whether such interest is received by will, inter vivos trust, or Oklahoma law of interstate (sic) succession. Upon the death of such non-Osage recipient, the Osage headright would vest in the remaindermen of Osage Indian blood designated **by the deceased Osage Indian's will or inter vivos trust.** If such will or inter vivos trust does not designate remaindermen of Osage Indian blood or **if the deceased Osage died intestate,** the Osage headright would be vested in his heirs of Osage Indian blood pursuant to the Oklahoma law of intestate succession. If there be no such remaindermen of Osage Indian blood nor heir of Osage Indian blood, such Osage headright would vest in the Osage Tribe, and the tribe would be required to pay the estate of such non-Osage recipient the market value of such Osage headright interest. (emphasis added)

It is made clear in S.Rep. No. 1157 at pages 8 and 10 that the members of the Select Committee on Indian Affairs considering the legislation understood § 7 of the 1978 Act in the way explained by the Office of the Secretary. The Committee explained the import of § 7 as follows at page 10 of the Report: "[s]ection 7 prohibits a person not of Osage blood from receiving more than a life estate in an Osage headright interest **owned by an Osage Indian.**" (emphasis added)

As can be seen by the above quotations from the legislative history, particularly the highlighted portions thereof, nothing therein would lead one to conclude that a non-Indian is prohibited from receiving more than a life estate when a devise is made by the will of a non-Indian, like Mae, who owned the headright for a period of thirty (30) years prior to passage of the 1978 Act. Instead, a thorough review of the legislative history leads to the conclusion the prohibition on receipt of more than a life estate by a non-Indian only applies to those situations involving passage of the headright interest of an **Osage Indian decedent,** not to the situation where the deceased owner of the headright was a non-Indian, like Mae, who devised it by will. No other interpretation of the 1978 Act is possi-

ble in our view and like the Department of the Interior we believe Congress did not intend the 1978 Act to apply to situations as here, where the headright was being devised by the will of a non-Indian, like Mae, who owned the headright long prior to promulgation of the Act. We now turn to a discussion of § 8 of the 1978 Act to see if it lends any support to appellants' position(s) in this case.

Section 8 of the 1978 Act provides:

(a) Any individual right to share in the Osage mineral estate (commonly referred to as a "headright") owned by a person not of Indian blood may not, without the approval of the Secretary of the Interior, be sold, assigned, or transferred. Sale of any such interest shall be subject to the right of the Osage Tribe to purchase it within forty-five days at the highest legitimate price offered the owner thereof.

(b) Prior to the time an[y] tribal mineral income is segregated for distribution to individual headright owners, the Secretary of the Interior, at the request of the Osage Tribal Council, may direct the use of any such income for the purchase of Osage headright interests offered for sale to the Osage Tribe pursuant to this section or vested in the Osage Tribe pursuant to section 7 of this Act.

As we read § 8, particularly subsection 8(a), which is the pertinent part for purposes of our discussion, although it does concern the sale, assignment or transfer of a headright owned by a non-Indian, **it in no way** expressly concerns itself with devise by will. The provision plainly applies **only** to *inter vivos* transfer by non-Indians. This can be the only meaning of the provision given the last sentence of subsection 8(a) wherein the Osage Tribe is given a right of first purchase "at the highest legitimate price offered the owner thereof." In a situation where the headright is passing under a devise by will there would be no price offered to the owner of the headright, the headright would merely be passing to the devisee(s) designated in the will of a decedent.

As spelled out in the testimony of Mr. Wood, former Field Solicitor, the Department of the Interior construed the provision in the same manner we do, i.e. it is applicable only in situations involving *inter vivos* transfer by non-Indians. It has no application to a devise of a headright interest by the will of a non-Indian. As with the contemporaneous construction given § 7, the executive interpretation of subsection 8(a), although not controlling, is entitled to great respect under *In Re Pryor's Estate, supra.* We have been provided no valid arguments by appellants that would cause us to conclude 8(a) was intended to have some applicability when a headright was passing by devise under the will of a non-Indian.

It now becomes incumbent upon us to determine whether the 1984 Act, the Act controlling the instant matter and the Act which amended the 1978 Act, was somehow intended by Congress to alter the above state of affairs so that a devise by the will of a non-Indian, like Mae, who owned the full beneficial interest in a headright long prior to passage of either the 1978 or 1984 Acts, would be subject to the restriction that a non-Indian is prohibited from receiving more than a life estate in a headright.

## 1984 ACT

Current restrictions on alienation of Osage headright are found in the 1984 Act. As relevant here the 1984 Act contains amendments to the 1978, the 1925, and the 1912 Acts. The primary provision of the 1984 Act relied on by appellants in support of their position is the following amendment to § 7 of the 1978 Act where subsection 2(e) of the 1984 Act provides in pertinent part:

(e) Section 7 of [the 1978] Act is amended to read as follows:

### RULES GOVERNING DEVOLUTION OF INTERESTS IN OSAGE HEADRIGHTS

Sec. 7. (a) GENERAL RULE.—No person who is not an Osage Indian may, on or after October 21, 1978, receive any interest in any headright, other than a life estate in accordance with subsection (b), whether such interest would be received by such person (but for this subsection) under a

will, a testamentary or inter vivos trust, or the Oklahoma laws of intestate succession.

Appellants rely on 7(a) to argue that after October 21, 1978, no non-Osage Indian may receive more than a life estate in any testamentary devise of a headright interest, whether the testamentary devise at issue is made by an Osage Indian, non-Osage Indian or non-Indian. Appellants' submissions on appeal when speaking of 7(a) continually ignore and are divorced from subsection 7(b), which is referred to in 7(a). Appellants' arguments further ignore the rest of subsection 2(e) of the 1984 Act, which amended § 7 of the 1978 Act. We do not believe subsection 7(a) can be read in such isolation. Instead, it must be read in the context of these other subsections to properly interpret the intent of Congress.

Subsection 7(b) provides:

(b) EXCEPTION FOR LIFE ES-TATES.—Notwithstanding subsection (a) and subject to section 5(d)(2), an individual who is not an Osage Indian may receive a life estate in any headright held by a testator, settlor, or decedent who is or was **an Osage Indian** under a will, or under a testamentary trust established by a will, of such testator, an inter vivos trust established by such settlor, or the Oklahoma laws of intestate succession relating to the administration of the estate of such decedent. (emphasis added)

As can clearly be seen, 7(b) applies to allow an individual not an Osage Indian to receive a life estate when the owner of the headright **is an Osage Indian** testator, settlor or decedent. Passage of a headright by the will of a **non-Osage Indian,** like Mae, is nowhere mentioned in 7(b).

Other parts of subsection 2(e) of the 1984 Act solely involve the disposition to be made of a headright after it has initially been disposed of by the will or trust of **an Osage Indian** testator or settlor or by the laws of intestate succession when the decedent owning the headright was **an Osage Indian.** The provisions add subsections 7(c) and 7(d) to § 7 and set forth the disposition to be made of a headright after the death of an individual who held a life estate under the provision of subsection 7(b) quoted above, i.e.

in a situation where the testator or settlor granting the life estate to such an individual or the decedent passing the headright by intestate succession **is or was an Osage Indian.** Subsections 7(c) and 7(d) provide:

[7](c) SPECIAL RULES GOVERNING INTERESTS IN OSAGE HEADRIGHT UPON DEATH OF INDIVIDUAL WHO HELD LIFE ESTATE IN SUCH HEAD-RIGHT.—

(1) DESIGNATED OSAGE REMAIN-DERMEN.—Upon the death of any individual who is not an Osage Indian and who held a life estate in any headright **of a testator or settlor described in subsection (b),** all remaining interests in such headright shall vest in any remaindermen who—

(A) are designated in the will of the testator or the instrument establishing the trust of the settlor to receive such remainder interest, and

(B) are Osage Indians.

(2) NO DESIGNATED OSAGE RE-MAINDERMEN.—Upon the death of any individual who is not an Osage Indian and who held a life estate in any headright **of a testator, settlor, or decedent described in subsection (b)** who—

(A) did not designate any remainderman who is an Osage Indian to receive any remaining interest in such headright **in the will of such testator or instrument of such settlor,** or

(B) died intestate,

all remaining interests in such headright shall vest in any heirs, as determined under the Oklahoma laws of intestate succession, **of such testator, settlor, or decedent** who are Osage Indians.

(3) NO HEIR WHO IS AN OSAGE INDIAN.—Upon the death of any individual who is not an Osage Indian and who held a life estate in any headright of an **Osage testator, settlor, or decedent described in subsection (b)** who—

(A) designated no remainderman who is an Osage Indian for any remaining interest in such headright, and

(B) had no heir under the Oklahoma laws of intestate succession who is an Osage Indian and is living at the time of death of the individual who held such life estate,

all remaining interests in such headright shall vest in the Osage Tribe of Indians.

[7](d) LIABILITY OF TRIBE IN CASE OF REMAINDERMAN OR HEIR WHO IS NOT AN OSAGE INDIAN.—In any case in which—

(1) any remainder interest **of a testator, settlor, or decedent described in subsection (b)** vests in the Osage Tribe of Indians under subsection (c)(3), and

(2) an individual who is not an Osage Indian and, who, but for this section, would have received any portion of such remaining interest in the headright by virtue of—

(A) having been designated **under the will of such testator, or the instrument of such settlor** which established any such trust, to receive such remainder interest, or

(B) being the heir of **such decedent** under the Oklahoma laws of intestate succession, the tribe shall pay any such individual the fair market value of the portion of the interest in such headright such individual would have received but for this section.

▆▆▆ In that subsections 7(b), (c) and (d) are concerned only with situations where the testator, settlor or decedent owning the headright and initially disposing of it by will, trust or intestate succession **is an Osage Indian** and these subsections nowhere mention a situation where the testator, settlor or decedent **is a non-Osage Indian,** if we were to follow appellants' apparent position of giving an absolutely literal interpretation to each subsection of § 7, divorced from the other subsections, it would mean a non-Osage Indian could not even devise by will a life estate to a non-Indian. This is so because there are no provisions for a non-Indian to do so in 7(b) and there are no rules in 7(c) and (d) for the subsequent disposition of such a non-Indian owned headright, but only for headrights owned by Osage Indian testators, settlors or decedents. In our view, it would be absurd to think that Congress could have intended such a complete disallowance of non-Osage Indian testamentary authority, without expressly stating so. Construction that would lead to an absurdity must be avoided and a rational construction must be given to a statute when the language fairly permits. *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Commission, supra,* 764 P.2d at 179. Furthermore, as stated when discussing the 1978 Act, words of a statute are to be understood as used, not in any abstract sense [*State ex rel. Rucker v. Tapp, supra,* 380 P.2d at 264] and the words used in a part of a statute must be interpreted in light of their context and understood in a sense which best harmonizes with all other parts of the statute. *Id.*

In our opinion, read in context with the entirety of § 7, the limitation on the receipt of more than a life estate by a non-Osage Indian in subsection 7(a), applies only in the situation where the testator, settlor or decedent is an Osage Indian, not to a situation where the devisor is a non-Indian who lawfully owned the full beneficial interest in the headright prior to passage of both the 1978 and 1984 Acts. The absence of rules governing **any** situation where the testator, settlor or decedent owning the headright is a non-Indian, in our view, is highly persuasive that Congress never intended § 7 to be applicable to headright interests where the full beneficial interest is owned by persons who are not Osage Indians. This view appropriately avoids any unintended absurd results and, instead, gives a rational construction to the whole of § 7 of the 1984 Act—a construction the language contained therein fairly permits.

If there is some ambiguity in the 1984 Act because of the apparent facial inconsistency between subsection 7(a) and the other subsections of § 7 the legislative history clears it up. In speaking of subsection 2(e) of the 1984 Act H.R.Rep. No. 1115, 98th Cong., 2d Sess. 2 (1984), says: "Paragraph (e) amends section 7 of the 1978 Act. **The amendments are technical in nature.**" (emphasis added) In other words, there is no indication in the legislative history to the 1984 Act that would point to the conclusion Congress intended amended § 7 to be a **substantive** change as to the purpose of § 7 as set forth in the 1978

Act so that now the section would apply to devise of headright interests by the wills of non-Indians, like Mae. Thus, both the context in which subsection 7(a) must be read and the legislative history lead to the conclusion § 7 applies **only** to situations where the testator, settlor or decedent is **an Osage Indian,** not where the testator owning the full beneficial interest in the headright at the time of death was a non-Indian, having lawfully acquired it under previous law.

■ In addition to their reliance on subsection 7(a), appellants cite to subsection 2(c) of the 1984 Act which amended subsection 5(d) of the 1978 Act to support their interpretation of the 1984 Act. The full text of subsection 2(c) of the 1984 Act is:

Section 5(d) of [the 1978] Act is amended to read as follows:

(d)(1) Notwithstanding any provision of—

(A) section 3 or 8 of the Osage Indians Act of 1912 (as amended by subsections [5](b) and [5](a), respectively), or

(B) section 7 of the Osage Indians Act of 1925 (as amended by subsection [5](c)), any sale or transfer or any disposition by any other means of any headright shall be subject to section 7 of this Act.

[d](2) Notwithstanding section 6(a) of this Act or section 8 of the Osage Indians Act of 1912, no Osage Indian may—

(A) provide for the transfer of any interest of such person in any headright—

(i) by will to any person which is not an individual, or

(ii) by the establishment of an inter vivos trust for the benefit of any person who is not an individual, or

(B) provide, whether by the terms of a will, the terms of a testamentary trust established by a will, or by the terms of an instrument establishing an inter vivos trust, that any interest in any headright—

(i) which such Osage Indian had (at the time of death of such person or at the time any such inter vivos trust was established), and

(ii) in which any individual was granted a life estate by such Osage Indian, may be transferred to or held for the benefit of any individual who is not an Osage Indian upon the death of the individual who held such life estate.

Appellants rely on subsection 5(d)(1) to argue the plain language thereof does not limit the applicability of § 7 to dispositions *only* by Osage Indians, but in broad language subjects any disposition of a headright to the prohibition in § 7 on a non-Osage Indian receiving more than a life estate. We disagree.

As we pointed out with regard to the 1978 Act, all of the other provisions referenced in 5(d) concern dispositions by **Osage Indians.** That has not changed in the 1984 Act. Sections 3 and 8 of the 1912 Act, as amended by subsections 5(b) and 5(a) of the 1978 Act concern, respectively, the property of deceased, minor or incompetent **Osage Indians** and the allowance of **an Osage Indian** to dispose of property by will. Section 7 of the 1925 Act, as amended by the 1978 Act in subsection 5(c) thereof, pertains to the ability of non-Indians to inherit by the laws of intestate succession, from **Osage Indians.** Thus, although facially and taken out of context new subsection 5(d)(1) might be taken as not limited to headright interests owned by Osage Indians, when read in context, the provision is so limited, just as its 1978 Act counterpart was so limited.[9]

If doubt remains as to the meaning of § 5(d) as amended by the 1984 Act we believe perusal of the legislative history to the 1984 Act clears it up. In speaking of the amendment of 5(d) by the 1984 Act, H.R.Rep. 1115, 98th Cong., 2d Sess. 2 (1984) states:

9. We note that §§ 3 and 8 of the 1912 Act, and § 7 of the 1925 Act were further amended by the 1984 Act [98 Stat. 3166–3168], to include references to §§ 5(d) and 7 of the 1978 Act. Other amendments were also made in the provisions, none of which would point to a conclusion that

these provisions, as amended, were meant to restrict the ability of non-Indians such as Mae, who lawfully came to own headright interests long prior to passage of either the 1978 or 1984 Acts, to devise by will the full beneficial interest in such headright to non-Indians.

Paragraph [2](c) [of the 1984 Act] amends the whole text of section 5(d) of the 1978 Act (P.L. 95–496). The new language adds **further restrictions on Osage Indians** to provide for the transfer of headright interests by will, testamentary trusts or inter vivos trust to persons who are not individuals, such as, for instance, a corporation. The paragraph also prevents such devises to individuals who are not Osages. (emphasis added)

The legislative history only speaks in terms of adding further restrictions **on Osage Indians.** No indication is given that anything in amended 5(d) is to limit the ability of a non-Indian lawfully owning a headright under law(s) prior to either the 1978 or 1984 Acts to pass the full beneficial interest in that headright to a non-Indian devisee by will. The further restrictions of subsection 5(d)(2) are placed **only on Osage Indians,** where limitations are put on an Osage Indian's ability to transfer to non-individuals, such as corporations or churches. No such prohibition or limitation is even hinted at when the headright is owned by a non-Indian such as Mae who lawfully owned the headright interests involved here for a thirty (30) year period prior to passage of the 1978 Act.

In our view, although Congress could have worded subsection 5(d)(1) more precisely to expressly limit the provision to dispositions by Osage Indians, as it did with subsection 5(d)(2), the context within which 5(d)(1) must be taken leads to the conclusion Congressional intent was to limit all of subsection 5(d) to dispositions by Osage Indians. The other subsections of § 5, i.e. 5(a), (b) and (c) are all concerned only with disposition **by Osage Indians** and we will not add a prohibition or limitation on non-Indians when Congress did not intend such a result.

As with the 1978 Act, the contemporaneous construction of the 1984 Act by the Department of Interior, as expressed through Mr. Wood, the former Field Solicitor, was that the 1984 Act was not meant to prohibit or limit the ability of a non-Indian such as Mae to pass by will a headright interest to a non-Indian devisee. This construction is entitled to great respect [*In Re Pryor's Estate, supra* ] and although it is not controlling it comports with our interpretation of the 1984 Act in such regard.

 In addition to the above amendments concerning dispositions of headright interests by wills, testamentary or *inter vivos* trusts or intestate succession, Congress in the 1984 Act amended subsection 8(a) of the 1978 Act concerning sale, assignment or transfer by a person not of Indian blood. Subsection 2(f) of the 1984 Act provides in such regard:

(f) Sec. 8(a) of [the 1978] Act is amended to read as follows:

Sec. 8. (a)(1) No headright owned by any person who is not of Indian blood may be sold, assigned, or transferred without the approval of the Secretary. Any sale of any interest in such headright (and any other transfer which divests such person of any right, title, or interest in such headright) shall be subject to the following rights of purchase:

(1) First right of purchase by the heirs in the first degree of the first Osage Indian to have acquired such headright under an allotment who are living and are Osage Indians, or, if they all be deceased, all heirs in the second through the fourth degree of such first Osage Indian who are living and are Osage Indians.

(2) Second right of purchase by any other Osage Indian for the benefit of any Osage Indian in his or her individual capacity.

(3) Third right of purchase by the Osage Tribal Council on behalf of the Osage Tribe of Indians.

No owner of any headright shall be required, by reason of this subsection, to sell such headright for less than its fair market value or to delay any such sale more than 90 days from the date by which notice of intention to sell (or otherwise transfer) such headright has been received by each person with respect to whom a right of purchase has been established under this subsection.

As with the 1978 Act nothing in this provision indicates a right of first purchase applies

when the headright is passing to a non-Indian devisee under the will of a non-Indian devisor, like Mae. The contemporaneous construction by the Department of the Interior given to amended subsection 8(a), as with its predecessor in the 1978 Act, is that the right of first purchase applies only to *inter vivos* sales, assignments or transfers. This contemporaneous construction by the executive officials charged with administering the 1984 Act is entitled to great respect [*In Re Pryor's Estate, supra*] and although it is not controlling we agree with it. The provision simply nowhere references testamentary devise of a headright interest owned by a non-Indian decedent and to read such into subsection 8(a) would not be consistent with the language contained therein. Surely, Congress was aware that the 1924 Act, *supra*, discussed in the **HISTORICAL ANALYSIS** part of this opinion, which allowed sale by non-Indians with Secretary approval, had never been interpreted to apply in a testamentary situation, but only to *inter vivos* transfers by non-Indians. In our view, had Congress intended the 1984 Act to grant a right of first purchase in the case of non-Indian devise by will we believe it would have specifically worded section 8 as being applicable to sale, assignment, transfer, or **testamentary devise.** Congress did not do so and we will not re-write 8(a) to so apply it where Congressional intent is lacking.

Appellants' have cited only two cases that have interpreted the 1984 Act—the Tenth Circuit case of *Akers v. Hodel, supra* and the Oklahoma Court of Appeals case of *Eckelt v. Herrell, supra.* Neither case supports appellants' position in this matter.

*Akers* nowhere involved the issue of whether the 1984 Act applied to limit a non-Indian from receiving more than a life estate when a headright was devised by the will of a non-Indian, who owned the full beneficial in-terest in the headright by virtue of having acquired it under laws prior to either the 1978 or 1984 Acts. Instead, the two issues in *Akers* were 1) whether the testator fell under the federal definition of an Osage or Pawnee Indian—the answer to which had an effect on whether the testator's will was subject to approval by the Osage Indian Agency or a separate federal administrative law judge, and 2) whether the testator suffered from an insane delusion as to his parentage of a certain child. As to whether he was an Osage Indian for purposes of having his will approved by the Osage Indian Agency, the issue concerned whether any quantum of Osage blood was sufficient or whether something more was necessary under pertinent federal law. Determination was made that something more than any quantum of Osage blood was necessary and that **the testator was an Osage Indian.** *Akers* simply does not intimate that §§ 7 or 8 of the 1978 or 1984 Acts would apply to the testamentary devise by the will of a non-Indian, like Mae. If anything, *Akers* supports our interpretation of the 1984 Act because in footnote 12 at 871 F.2d at 932, the Tenth Circuit says the following: "[s]ection 7, as amended [by the 1984 Act], prohibits any person who is not 'an Osage Indian' from receiving more than a life estate in an Osage headright **owned by an Osage Indian.**" (emphasis added) We do not, however, rely on this language of the Tenth Circuit because that court simply did not have before it the question of whether § 7 applied to the testamentary dispositions of headrights owned by non-Indians, like Mae.[10]

The *Eckelt* case also provides no assistance to appellants' cause. It merely held that the 1984 provisions of subsection 8(a)(1) quoted above concerning rights of first purchase in situations involving transfers by non-Indian owners of headrights did not operate to pre-

10. The blanket statement in *Akers* in the text of the Tenth Circuit's opinion [871 F.2d at 930] that, "since 1984 no more than a life estate in the headright can be conveyed to one who is not an Osage Indian", must be read in context. That context is 1) that *Akers* concerned an **Osage testator** generally and 2) where the statement is made in the text of the opinion, the Tenth Circuit is discussing specifically dispositions by **Osage decedents.** To read the quotation to be a blanket endorsement by the Tenth Circuit of the view espoused by appellants here would obviously be a mistake given the Tenth Circuit's statement in footnote 12 of the *Akers'* opinion [871 F.2d at 932], quoted by us in the body of this opinion, to the effect the prohibition on a non-Osage Indian receiving more than a life estate comes into play when the headright is owned by an **Osage Indian.**

vent a creditor from garnishing headright proceeds paid to a non-Indian owner of headright interests and held by a bank. The case did not concern a testamentary devise by a non-Indian nor any holding that §§ 7 or 8 applied to a **testamentary** devise by a non-Indian, like Mae.[11]

## CONCLUSION

■ In the final analysis, our view is that Congress intended by the 1984 Act to put in place provisions geared toward retention of Osage ownership in those headright interests already in Osage ownership, with an exception of allowing Osage Indians to grant life estates to non-Osage Indians in certain situations, and that after the death of a non-Osage Indian having been granted such a life estate, the headright would return to Osage ownership. This purpose is embodied in § 7. The 1984 Act further put in place a method to allow the opportunity for reacquisition of headright interests by individual Osages or by the Osage Tribe when a non-Indian lawfully owning a headright interest seeks to transfer that headright *inter vivos*. Such reacquisition is fostered by the rights of first purchase contained in § 8. We see no Congressional intent in the 1984 Act to prohibit a non-Indian from receiving more than a life estate when the headright interest involved is being devised by the will of a non-Indian, like Mae, who lawfully owned the full beneficial interest in the headright at the time of death, having acquired such interest long prior to passage of either the 1978 or 1984 Acts. The trial court's ruling approving distribution of the headright interest to the non-Indian nephews of Mae Little Bear was, thus, correct.

Accordingly, the Court of Appeals Memorandum Opinion is **VACATED** and the judgment of the trial court upholding the devise of 1.25 headright interest to appellees is **AFFIRMED**.

ALMA WILSON, C.J., and SIMMS, HARGRAVE, SUMMERS and WATT, JJ., concur.

KAUGER, V.C.J., and OPALA, J., concur by reason of stare decisis.

HODGES, J., not participating.

---

**11.** In view of our determination the 1984 Act does not limit to a life estate a devise of a headright by a non-Indian testator, like Mae, to a non-Indian devisee, we need not determine appellants' argument that a devise of more than a life estate is void and cannot be modified to a life estate. We do note, however, a recent decision of the United States Court of Appeals for the Tenth Circuit where a like argument was rejected. In *Crawley v. United States*, 977 F.2d 1409 (10th Cir.1992), the Tenth Circuit held in a case involving an Osage Indian testator that the Secretary of Interior may modify a will that grants more than a life estate to a non-Osage devisee to a life estate to carry out to the fullest extent possible under federal law the Osage testator's intent.